IRENE CARUSO, Special Adm'x of the Estate of Phillip Caruso, Deceased, Plaintiff-Appellee, v. PINE MANOR NURSING CENTER, Defendant-Appellant.

First District (5th Division)   No. 1—88—0759

Opinion filed April 28, 1989.

Williams & Montgomery, Ltd., of Chicago (James K. Horstman, Barry L. Kroll, Thomas H. Neucranz, and Lloyd E. Williams, Jr., of counsel), for appellant.

Donald A. Shapiro and Kristin M. Boyer, both of Donald A. Shapiro, Ltd., of Chicago, for appellee.

Todd A. Smith, of Corboy & Demetrio, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

Steven M. Levin and Lynn Worley, both of Steven M. Levin & Associates, of Chicago, for *amicus curiae* Illinois Citizens for Better Care.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Defendant Pine Manor Nursing Center (Pine Manor) appeals from a jury verdict awarding $65,000 in damages to plaintiff Irene Caruso (Caruso), special administratrix of the estate of Phillip Caruso, deceased, which was increased to $195,000 by the trial court (three times her actual damages) pursuant to section 3—602 of the Nursing Home Care Reform Act of 1979 (Ill. Rev. Stat. 1987, ch. 111½, par. 4153—602). On appeal, defendant contends: (1) judgment should have been entered in its favor as a matter of law because plaintiff failed to make a *prima facie* showing on the issue of causation; (2) the trial court committed reversible error in barring its expert from testifying; (3) the jury's verdicts on counts I and II are inconsistent, requiring reversal of the judgment entered; (4) the court erred in excluding all evidence pertaining to its prepared nursing care plan; (5) the jury's award of damages was grossly excessive; and (6) the court erred in awarding plaintiff treble damages and attorney fees. For the reasons set forth below, we reverse and remand the cause for a new trial.

Phillip Caruso (Phillip) was treated at Christ Hospital from October 22, 1981, to November 11, 1981, and again from December 2, 1981, to January 22, 1982, for Parkinson's disease, dementia, organic brain syndrome, nephritis (kidney disease), periodontal disease, renal insufficiency, urinary tract infection, and a kidney infection. On January 22, 1982, he was released from Christ Hospital and admitted to Pine Manor, where he was seen by a nurse who took a history and prepared a nursing evaluation. On January 23, Dr. George Cromydas, a part-time employee of a medical group which provided doctors' services to residents at Pine Manor, conducted an initial examination and assessment of Phillip. He found Phillip to be in a stable condition at that time; Phillip's skin exhibited a normal turgor (an indication of adequate hydration) and he was responsive to commands during the examination. Dr. Cromydas ordered routine lab tests but did not put a "rush" on them. According to the Pine Manor nurses, during Phillip's stay at the center he received three meals a day, three snacks which included juice or milk, medications four times a day with which he was given four ounces of water, and he was offered something to drink during the nighttime every two hours when the nurses would wake him to change bed clothing and to reposition him. Pine Manor did not keep a chart of Phillip's intake or output of fluids, however.

On January 29, Phillip was taken to Christ Hospital. According to the emergency room records, he was weak, confused, suffering from tremors and his skin condition was dry with poor turgor. The emergency room doctor's diagnosis was that Phillip was suffering from severe dehydration. On February 2, Dr. Kent Armbruster, a nephrologist, examined Phillip and diagnosed his condition as "renal insufficiency with superimposed dehydration." Phillip was rehydrated with IV fluids. He also had to be catheterized, which caused a urinary tract infection as a result of which additional treatment was needed. He was released from Christ Hospital on February 19 and transferred to Oak Forest Hospital, where he died on May 14. No claim was made by Caruso that Phillip's death was causally related to his dehydration period.

On June 18, 1982, Caruso filed a two-count complaint against Pine Manor. In count I, Caruso sought compensatory damages and alleged a cause of action based on common law negligence in the care and treatment of Phillip while he was a resident at Pine Manor, resulting in his becoming dehydrated. In count II, Caruso sought treble damages and alleged a cause of action under the Nursing Home Care Reform Act (Ill. Rev. Stat. 1981, ch. 111½, par. 4153—602) charging that Pine Manor abused and neglected Phillip by failing to give him sufficient water such that he became dehydrated, leading to a deterioration of his physical and mental condition. After trial, the jury found Pine Manor liable under count II, but not count I, the trial court tripled the jury's damages verdict pursuant to section 3—602 of the Nursing Home Care Reform Act (Ill. Rev. Stat. 1987, ch. 111½, par. 4153—602) and awarded plaintiff attorney fees, and this appeal followed.[1]

■ Under the Nursing Home Care Reform Act (the Act), "[t]he owner and licensee [of a nursing home] are liable to a resident for any intentional or negligent act or omission of their agents or employees which injures the resident." (Ill. Rev. Stat. 1981, ch. 111½, par. 4153—601.) The Act defines "neglect" as "a failure in a facility to provide adequate medical or personal care or maintenance, which failure results in physical or mental injury to a resident or in the deterioration of a resident's physical or mental condition." (Ill. Rev. Stat. 1981, ch. 111½, par. 4151—117.) Personal care and maintenance in-

---

[1]The Illinois Citizens for Better Care and the Illinois Trial Lawyers Association were granted leave to file *amicus curiae* briefs relative to the issues raised under the Nursing Home Care Reform Act (Ill. Rev. Stat. 1987, ch. 111½, par. 4151—101 *et seq.*).

clude providing food and water and assistance with meals necessary to sustain a healthy life. Ill. Rev. Stat. 1981, ch. 111½, pars. 4151–116, 4151–120.

■ In the instant case, Pine Manor did not, prior to trial, move to dismiss either count I or II for failure to state a cause of action. On appeal, we reject this argument based on the manifest weight of the evidence presented. We first observe that Pine Manor concedes in its appellate brief that Caruso produced some evidence of negligence and of injury. Its argument is solely that Caruso failed to produce "testimony" to establish a causal link between the asserted negligence and the asserted injury. Contrary to its argument, however, there was evidence that Phillip's stable physical and mental condition deteriorated after his 6½ days' stay in Pine Manor. When he entered Pine Manor on January 22 he could speak his name, he exhibited a significant degree of orientation, he had normal skin turgor and he was a "pleasant, smiling man." By January 25 the Pine Manor chart described him as combative and, on January 28 and 29, his mouth appeared parched and cracked and his skin turgor was "poor." When Phillip was taken to Christ Hospital from Pine Manor, the emergency room doctor diagnosed him as suffering from severe dehydration. Dr. Armbruster stated that Phillip was dehydrated and that "the most likely cause of the dehydration would be slightly inadequate intake of fluid." Dr. Armbruster further testified that Phillip was apparently dependent upon Pine Manor staff for fluids because he had central nervous system problems and that dehydration played a role in Phillip's "changing mental status" and that "it was one of the reasons that occasioned his admission back into *** [Christ] Hospital." We further note that Pine Manor offered no alternative explanation for Phillip's dehydrated condition and Pine Manor kept no chart of Phillip's intake and output of fluid, which Caruso's medical expert, Nurse Marcia Bregman, testified was a required, standard nursing home procedure that should have been followed, but was not, for a person in Phillip's physical condition. Clearly, therefore, the evidence presented showed a proximate cause of Phillip's dehydration as a result of his stay at Pine Manor; it was not unreasonable for the jury to conclude that Phillip did suffer dehydration and that Pine Manor's treatment of him caused his dehydration.

■ Notwithstanding the foregoing, however, we must reverse and remand this cause for a new trial based on the trial court's reversible error (see *McCaffrey v. Illinois Central Gulf R.R. Co.* (1979), 71 Ill. App. 3d 42, 388 N.E.2d 1062) in barring Pine Manor's expert's testimony as a sanction for introducing a basis for one of his opinions

that Phillip was not dehydrated at the end of his stay at Pine Manor, which was different from the opinions expressed in his deposition. Pursuant to Supreme Court Rule 220 (107 Ill. 2d R. 220), sanctions imposed for violations of discovery rules must be proportionate to the gravity of the violation. (*Peoples Gas, Light & Coke Co. v. Chicago Black Improvement Association* (1986), 148 Ill. App. 3d 1093, 502 N.E.2d 8.) The purpose of a sanction pursuant to Rule 220 is not to punish (*Bautista v. Verson Allsteel Press Co.* (1987), 152 Ill. App. 3d 524, 504 N.E.2d 772), but to insure fair discovery and a trial on the merits (*Bell v. Board of Education* (1978), 67 Ill. App. 3d 402, 385 N.E.2d 84). A trial court's exercise of its broad discretion in imposing sanctions for discovery violations will not be disturbed absent a clear abuse. See *Brzezinski v. Gajda* (1972), 5 Ill. App. 3d 977, 284 N.E.2d 383.

Here, Pine Manor's expert, Dr. David Petty, testified at great length, without objection by Caruso's counsel, concerning Phillip's BUN/creatinine ratios (two waste products produced by the human body). Subsequently the court recessed and found, in a conference outside the jury's presence, that Dr. Petty's testimony exceeded the scope of the matters developed in his deposition, and granted plaintiff's motion to bar his testimony completely. The court, in stating to the parties that it was familiar with Dr. Petty's deposition testimony, also refused to allow Pine Manor to make an offer of proof as to what Dr. Petty would testify to concerning Phillip's alleged dehydrated condition and Pine Manor's treatment of him.

The record further discloses that as another basis of the trial court's sanction, it admonished Pine Manor's counsel that Dr. Petty spent a considerable period of time in testifying to a matter not expressed in his deposition and that counsel for Pine Manor apparently had not sufficiently prepared for trial because he otherwise would have known that this testimony was outside the scope of Dr. Petty's deposition. Pine Manor, in response, pointed out to the court that he believed that the testimony was within the scope of Dr. Petty's deposition and that, in any event, plaintiff could and should have objected immediately to Dr. Petty's testimony on BUN/creatinine ratios and, in failing to do so, Pine Manor should not be penalized. Plaintiff's counsel stated to the court that he had failed to object to Dr. Petty's testimony because of its complexity; while Dr. Petty was testifying, "plaintiff's counsel was furiously trying to absorb Dr. Petty's highly technical testimony while at the same time trying to quickly review his extensive deposition abstract to confirm if Dr. Petty had ever talked about this before." We simply must reject this argument in

light of the fact that plaintiff's expert, Dr. Armbruster, had testified earlier concerning BUN/creatinine ratios and, according to plaintiff's counsel, "had decimated the defense on the question of dehydration, giving a fantastic lecture to the jury on the way the kidneys worked and explaining how Mr. Caruso's BUN/creatinine ratio, rather than isolated BUN readings or isolated creatinine readings, was the key factor in diagnosing dehydration." Clearly, therefore, the subject of BUN/creatinine ratios was not so complex that plaintiff's counsel needed time to absorb the nature and significance of Dr. Petty's testimony concerning BUN/creatinine ratios. More importantly, however, Petty's BUN/creatinine testimony was only one basis in support of his opinion that Phillip was not dehydrated. In his deposition, he also stated, in support of his opinion, that (1) Caruso had moist, clammy hands when he was returned to Christ Hospital, (2) that Phillip's sodium levels were in the normal range, (3) Phillip was capable of producing urine when he was admitted to Christ Hospital on January 29, (4) the specific gravity of the urine sample, which reflects the concentration of waste products in the urine, did not indicate dehydration, (5) Phillip's hemoglobin and hemacrit levels reflected that there was no hemoconcentration, which indicated that he was not dehydrated, (6) Phillip was not in shock, (7) by February 1 or 2, after a few days at Christ Hospital, Phillip actually became overly hydrated, such that a diuretic became necessary, and (8) throughout his stay at Pine Manor, Phillip was reported to have been wetting his bed, which indicated that his kidneys were not attempting to conserve water. Based on these facts, we find the trial court abused its discretion in completely barring Dr. Petty's testimony because he merely stepped outside the scope of the basis of one of his opinions. The court's action therefore constituted reversible error, requiring a new trial.

In light of the foregoing disposition, we find it unnecessary to address the remaining issues raised.

Reversed and remanded.

LORENZ and COCCIA, JJ., concur.