JULIA DIXSON, Adm'r of the Estate of Sherwood Dixson, Deceased, Plaintiff-Appellant, v. UNIVERSITY OF CHICAGO HOSPITALS AND CLINICS, Defendant-Appellee.

First District (6th Division)   No. 1—88—2857

Opinion filed November 1, 1989.

Ialongo & Meyer, of Chicago, for appellant.

Lord, Bissell & Brook, of Chicago (William C. Anderson III, Hugh C. Griffin, and Diane I. Jennings, of counsel), for appellee.

JUSTICE QUINLAN delivered the opinion of the court:

Plaintiff brought a medical malpractice action in the circuit court of Cook County against the defendant, the University of Chicago Hospitals and Clinics, alleging that the defendant was negligent and that its negligence proximately caused the death of plaintiff's husband. Following a trial before a jury, a verdict was rendered in favor of defendant. The trial judge then denied plaintiff's motion for a new trial. Plaintiff now appeals the jury's verdict to this court.

On March 28, 1977, the deceased, Sherwood Dixson, asked his wife, the plaintiff here, to take him to the emergency room at the University of Chicago Hospitals and Clinics (University hospital) because he was experiencing "strange feelings" and was having hallucinations. The doctors at the University hospital found nothing physically wrong with Dixson and recommended that he have a psychiatric evaluation. Dixson agreed and checked himself into the psychiatric ward of the University hospital.

The next day, Dixson became agitated and was told to go to the isolation area. Dixson refused to go, so the nurses summoned security guards. Dixson then began voluntarily walking toward the isolation area, but became violent when he reached the door to isolation. Consequently, the security guards restrained Dixson, and a nurse gave him a

shot containing five milligrams of Haldol, a tranquilizer. Shortly thereafter, Dixson appeared to experience cardiac arrest. A University hospital doctor telephoned plaintiff and told her that Dixson was in the cardiac care unit. The doctor told plaintiff to bring her family over immediately. When plaintiff arrived, the doctors asked her to sign a waiver so they could do a bypass on Dixson. Approximately 30 minutes later, however, plaintiff was informed that Dixson had died.

The cause of Dixson's death was initially listed as unknown pending further investigation. An autopsy was performed and tests for alcohol, barbiturates or tranquilizers, including Haldol, were negative. The medical examiner concluded that Dixson had died from "sickle cell crisis" and listed sickle cell crisis as the cause of death on Dixson's death certificate. Thereafter, on November 30, 1978, plaintiff, as administrator of Sherwood Dixson's estate, filed suit against the University hospital alleging medical malpractice and contending that the administration of Haldol caused Dixson's death. Plaintiff's complaint was subsequently amended four times.

Plaintiff's case finally went to trial in the circuit court of Cook County on January 22, 1988. Before the jury selection process began, defense counsel presented a motion to bar the testimony of Dr. Heller, one of plaintiff's experts, pursuant to Illinois Supreme Court Rule 220 (107 Ill. 2d R. 220). Defense counsel claimed that the trial court should bar Dr. Heller's testimony because he had not been revealed as an expert witness until January 15, 1988, one week before the case went to trial. In response, plaintiff claimed that she planned to call Dr. Heller to rebut the anticipated testimony of defendant's expert witness, who would assert that Dixson had died of sickle cell trait, and that she was unaware defendant was going to use that defense until December 29, 1987, when she deposed defendant's expert; therefore, her delay in disclosing Dr. Heller should be excused. However, the trial judge granted defendant's motion, ruling that plaintiff had known for at least 10 years that the defendant would claim that Dixson died from sickle cell crisis and not from the injection of Haldol, inasmuch as sickle cell was listed as the cause of death on Dixson's death certificate. Accordingly, the trial court held there was no new information which would justify plaintiff's late disclosure.

The parties then proceeded to jury selection. The trial court briefly described the case and asked the jury venire whether they objected to a case such as the present one, a civil suit for money damages; whether they would be able and willing to sign a verdict for the plaintiff in the amount they thought fair if the plaintiff proved her case; and whether they would be able to sign a verdict for the defendant if

plaintiff did not prove her case, even if she proved that her husband was injured. The trial court then asked the individual prospective jurors the following questions: have you or any member of your immediate family or a close friend ever been in any kind of an accident where anyone was hurt or claimed to be hurt and, if so, would you hold it against the parties here; have you or any member of your immediate family ever had any medical training and, if so, what kind, for how long, and was the training at a hospital; have you or any members of your immediate family or close friends ever worked or do they currently work for any hospital, clinic, mental health care facility or medical care provider; have you or any members of your immediate family or close friends worked as a security guard or do they currently work as a security guard and, if so, was it at a hospital; do you currently or have you had in the past any business association with any hospital, clinic, mental health care facility or medical care provider; and have you or any members of your family or close friends ever had any unsatisfactory experience with any doctor, hospital, clinic or health care provider.

Plaintiff's attorney then questioned the prospective jurors. Plaintiff's attorney told the prospective jurors that the case involved professional negligence and that there might be some evidence against nurses and security guards. He next asked the jurors if they would have any hesitance in awarding damages if the plaintiff proved her case, even though they might have relatives or friends who were nurses or security guards. After plaintiff's counsel had utilized this line of questioning on several prospective jurors, the trial judge instructed plaintiff's counsel to stop telling the jurors what he thought the evidence would show and what plaintiff would ask for at the end of trial. Plaintiff's counsel argued that he had a right to ask those questions because all the prospective jurors had revealed a connection to a hospital, nurse or security guard and, therefore, he should be allowed to determine whether that connection might affect their judgment, inasmuch as he was asking for a verdict based on the professional negligence of a nurse or security guard. The trial judge refused to allow plaintiff's counsel to continue his line of questioning, stating that the trial court had already asked the jury venire the same questions.

Following jury selection and opening arguments, the plaintiff presented her witnesses. Wendell Lovett testified that he was employed by defendant as a security guard on March 29, 1977, and was summoned to the psychiatric ward around noon to assist the other guards with a patient, who, Lovett said, was Dixson. When Lovett arrived at the psychiatric ward, four other guards were also present. Dixson was

standing near the doorway to his room and was not violent. Lovett said that Dixson started walking toward the guards and became violent, striking Earl Robertson, another guard. The guards then restrained Dixson, holding him down on the floor on his back as he continued to struggle. Lovett said he heard someone say they had a shot to give Dixson if the guards could hold him still. Lovett did not remember who gave Dixson the shot, but thought it was injected in Dixson's hip. Lovett testified that Dixson calmed down after receiving the shot.

John Naughton and Earl Robertson, who were also security guards employed by defendant on March 29, 1977, testified next. Their testimony essentially corroborated Lovett's testimony, except Naughton did not remember anyone giving Dixson a shot. Robertson also said that he did not see the shot being given to Dixson, and he remembered that Dixson was on his stomach as the guards restrained him, not on his back.

Plaintiff's next witness was Dr. Michael Schaffer, the chief toxicologist at the office of the medical examiner. Dr. Schaffer testified that his job was to perform tests to determine what, if any, chemical substances are in a deceased's body. Dr. Schaffer tested Dixson's body for alcohol, barbiturates and tranquilizers, including Haldol. Dr. Schaffer had been told that Dixson had received an intramuscular injection of five milligrams of Haldol prior to his death. Dr. Schaffer said his tests did not reveal any Haldol in the body, but that it was unlikely that the instruments used in 1977 would detect such a small quantity of Haldol in the blood. Dr. Schaffer said, however, that it was more likely that he would have detected the Haldol if it had been given intravenously rather than intramuscularly.

Elizabeth Walz, the assistant head nurse at the University hospital, also testified. Walz said she had no independent recollection of the events of March 29, 1977, and that she had to rely on her notes from that day. According to these notes, Dixson became agitated on March 29, 1977, and was encouraged to go to the isolation area. Dixson refused to go, so the security guards were summoned. When the guards arrived, they approached Dixson and he began walking toward the isolation area. When Dixson reached the door to the isolation area, however, he became "combative" with the guards. Consequently, Dixson was subdued and restrained on the floor by the guards. Walz noted that Dixson's right wrist appeared fractured. Dixson was then given five milligrams of Haldol in an intramuscular injection. Walz did not remember giving the injection to Dixson, even though she admitted that the nurse who writes the notes on a patient is usually the nurse that attended to that patient, but she said that the injection would

have been put in Dixson's deltoid muscle. Walz testified that the standard of care, when giving an intramuscular injection, is to insert the needle into the muscle and then pull back on the syringe to see if there is blood in the syringe. If there is blood in the syringe, the needle must be reinserted because the needle has hit a vein. Following the shot, according to the notes, Dixson appeared to go into cardiac arrest and the cardiopulmonary team was called.

Plaintiff also called her expert witness, Dr. O'Donnell, to testify. Dr. O'Donnell testified that he was a pharmacologist, a pharmacist and a nutritionist. Dr. O'Donnell told the court that Haldol was a tranquilizer used to treat major psychotic disorders and that it was much more potent than other tranquilizers. Dr. O'Donnell also said that tranquilizers can affect the blood pressure, causing it to drop.

Dr. O'Donnell then explained that an intravenous injection is an injection given directly into a vein. A drug given through an intravenous "push," which means the drug is put into the vein all at once, has a very rapid effect. In contrast, an intramuscular injection is an injection into the muscle tissue. Drugs given through intramuscular injections have a slower absorption rate, approximately 5 to 15 minutes before onset of the action of the drug, as opposed to the immediate onset of action for drugs injected intravenously.

Dr. O'Donnell's opinion was that Dixson died from an intravenous injection of Haldol. He said he believed the Haldol was given intravenously, even though the note said it was given intramuscularly, and he had two theories on how that happened. Dr. O'Donnell said either the person giving the shot failed to pull back on the syringe to check for blood, or the syringe was initially put into the muscle, but it slipped and hit a vein because Dixson was struggling. Dr. O'Donnell testified that in his opinion, five milligrams of Haldol given through an intravenous push could kill a person. On cross-examination, however, Dr. O'Donnell admitted that he had not encountered any articles describing sudden death as a result of an intravenous push injection of Haldol. Dr. O'Donnell also admitted that he was aware of articles describing the intravenous injection of Haldol, but said that those articles did not state whether the Haldol was given through an intravenous push or whether it was given slowly, over a matter of minutes.

Defendant's only witness was its expert witness, Dr. Hollister. Dr. Hollister testified that he was an M.D., board certified in internal medicine. Dr. Hollister said he had published several papers concerning Haldol and began researching the drug in 1962 or 1963. Dr. Hollister testified that in all of his research concerning Haldol, he was unaware of any reported instances where a five-milligram dose of Haldol, given

in an intravenous push, caused death. In addition, Dr. Hollister said that it was highly unlikely that an injection into the deltoid muscle, the hip or the buttocks would hit a vein because those areas have no major blood vessels, and the blood vessels present would be too small to penetrate.

Dr. Hollister then said that he had reviewed the records in this case, including the autopsy report, and concluded that Dixson died from sickle cell trait. Dr. Hollister felt that the medical examiner's conclusions were essentially correct, but he believed that Dixson's death was associated with sickle cell trait, rather than sickle cell crisis, which is the more severe form of the disorder. Dr. Hollister also said that he was initially uncertain as to how Dixson's death occurred, because it was so sudden. Dr. Hollister stated, however, that he then read an article concerning the sudden death of young, black military personnel following exertion, due to sickle cell trait, and he also read numerous case histories of similar instances, and he concluded that Dixson's death occurred in the same manner.

Following this testimony, the case went before the jury. The jury returned a general verdict in favor of University hospital, and also, in a special interrogatory, the jury said that they did not find Haldol to be the cause of Dixson's death. The trial court then entered judgment on the jury's verdict and denied plaintiff's post-trial motion, which had included a motion for a new trial. Plaintiff, as noted earlier, then filed this appeal.

The first issue that plaintiff raises on appeal is that the trial court abused its discretion and committed reversible error in limiting plaintiff's *voir dire* of the prospective jurors. Plaintiff contends that there was an area of potential prejudice on the part of the jurors which the trial court did not adequately explore. In support of her argument, plaintiff notes that one potential juror here was excused for cause after plaintiff's counsel asked her whether she could be fair despite the fact that her cousin was a nurse and her brother was a security guard. The juror told plaintiff's counsel that she was not certain she could be fair, even though she had already told the trial judge that her family connections would not affect her decision in this case.

The defendant argues that the trial court properly limited plaintiff's questions during *voir dire*. Defendant alleges that plaintiff's questions were repetitive and were impermissible attempts to indoctrinate the jury. Defendant also notes that the trial court provided the parties with a list of questions it planned to ask the prospective jurors, accepted questions submitted by plaintiff's counsel, and allowed the parties to question the jurors themselves. Accordingly, defendant main-

tains that the *voir dire* questioning in this case thoroughly disclosed all facts necessary to determine juror qualifications and to expose any prejudice.

■ The purpose of *voir dire* is to assure the selection of an impartial jury, free from bias or prejudice. (*Kingston v. Turner* (1987), 115 Ill. 2d 445, 464, 505 N.E.2d 320, 328.) The trial judge has the primary responsibility for initiating and conducting *voir dire*, and the scope and extent of *voir dire* are within his sound discretion. (*Kingston*, 115 Ill. 2d at 464, 505 N.E.2d at 329; see also 107 Ill. 2d R. 234.) Upon review, an abuse of discretion will be found only if the trial judge's conduct prevented the selection of an impartial jury. (*Kingston*, 115 Ill. 2d at 465, 505 N.E.2d at 329.) A juror, however, need not be completely ignorant of the facts and issues involved in a case, and it is sufficient if the juror can put aside his opinion and return a verdict based on the evidence presented. *Kingston*, 115 Ill. 2d at 467, 505 N.E.2d at 330.

In *Kingston*, the Illinois Supreme Court held that the trial court did not err in refusing to reopen *voir dire* in a dramshop case even though it was discovered that the fathers of two jurors were connected with other dramshops. (*Kingston*, 115 Ill. 2d at 452-53, 505 N.E.2d at 323.) The *Kingston* court found that the failure to disclose the fact that the jurors' fathers were connected with the dramshop business was due to the failure of plaintiff's attorney to adequately question the jurors. (*Kingston*, 115 Ill. 2d at 465, 505 N.E.2d at 329.) Further, the court stated that merely because the jurors' fathers were associated with dramshops did not indicate bias, nor did the jurors' failure to volunteer that information call into question their motives, because neither juror was personally associated with a tavern. (*Kingston*, 115 Ill. 2d at 466-67, 505 N.E.2d at 330.) Finally, the court noted that the two jurors had said they could be fair and would consider only the evidence presented at trial. *Kingston*, 115 Ill. 2d at 467, 505 N.E.2d at 330.

Defendant cites *Kingston* in support of its argument that the trial court properly limited plaintiff's *voir dire* questioning here. Defendant analogizes this case to *Kingston,* stating that merely because the jurors here were acquainted with or related to nurses and security guards did not indicate bias, especially since the jurors said they could be fair and would consider only the evidence presented at trial. Plaintiff, however, distinguishes *Kingston* based on the fact that it was the plaintiff's attorney in *Kingston* who failed to adequately question the jurors, while the plaintiff's attorney here wanted to question the jurors more extensively.

■ Upon reviewing the arguments of the parties, we find that the

trial court did not abuse its discretion in limiting plaintiff's questions during *voir dire*. Here, the questions asked of the prospective jurors revealed all connections with nurses, hospitals and security guards, unlike the situation in *Kingston,* where the dramshop connections were not revealed. As in *Kingston,* however, all the jurors said that they could be fair and would consider only the evidence presented. Further, all the jurors here heard the plaintiff question the juror who admitted she might be biased, and also saw that she was excused for that bias. In addition, the juror who was excused for cause also revealed that her brother had been in an automobile accident and had sued the City of Chicago, and her mother had sued a nursing home for not taking proper care of the juror's grandfather, factors which also presumably contributed to her bias. Finally, the record reveals that the trial court had already asked the jury the questions later asked by plaintiff's counsel. Hence, we conclude the trial court's conduct here did not prevent the selection of an impartial jury.

Plaintiff next argues that the trial court committed reversible error when it barred the testimony of Dr. Heller. Plaintiff claims that she did not violate Illinois Supreme Court Rule 220 (107 Ill. 2d R. 220), which governs timely and good-faith disclosure of expert witnesses, because Heller's testimony was disclosed within 90 days after it became known and there was no pretrial discovery date set in this case. Further, plaintiff contends that she was unaware of defendant's theory that sickle cell disease caused Dixson's death until she took Dr. Hollister's deposition on December 29, 1987, and that she promptly disclosed Heller as a rebuttal witness 15 days later.

In response, defendant contends that the trial court properly barred Dr. Heller's testimony. Defendant points out that the death certificate here, issued on June 23, 1977, listed sickle cell crisis as the cause of Dixson's death. Also, defendant states that plaintiff deposed the doctor who performed the autopsy on Dixson, apparently assuming defendant would call him to testify, but decided an expert witness was not needed to rebut that doctor's finding that Dixson died from sickle cell crisis. Defendant also notes that plaintiff did not even name an expert witness until October 7, 1987, when she disclosed Dr. O'Donnell, and she still listed Dr. O'Donnell as her sole expert witness on January 8, 1988, even though defendant had disclosed Dr. Hollister as its expert on October 26, 1987. Accordingly, defendant claims that plaintiff's disclosure of Dr. Heller on January 15, 1988, was not in compliance with Rule 220 and, therefore, disqualification of Dr. Heller as a witness was the proper sanction.

In her reply brief, plaintiff again argues that her disclosure of Dr.

Heller was in compliance with Rule 220. Plaintiff claims that Dr. Hollister's testimony was not known to her until his December 1987 deposition, and that she could not have anticipated his testimony because Dr. Hollister concluded that Dixson died from sickle cell trait, while the death certificate listed the cause of death as sickle cell crisis.

■ The purpose of Supreme Court Rule 220 is to promote timely and good-faith disclosure of expert witnesses. (*Jarmon v. Jinks* (1987), 165 Ill. App. 3d 855, 863, 520 N.E.2d 783, 787.) Rule 220 provides, in pertinent part:

> "Where the testimony of experts is reasonably contemplated, the parties will act in good faith to seasonably:
>
> "(i) ascertain the identity of such witnesses, and
>
> (ii) obtain from them the opinions upon which they may be requested to testify.
>
> In order to insure fair and equitable preparation for trial by all parties the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party either within 90 days after the substance of the expert's opinion first becomes known to that party or his counsel or, if the substance of the expert's opinion is then known, at the first pretrial conference in the case, whichever is later. In any event, as to all expert witnesses not previously disclosed, the trial court, on its own motion, or on the motion of any party after the first pretrial conference, shall enter an order scheduling the dates upon which all expert witnesses, including rebuttal experts, shall be disclosed. \*\*\* All dates set by the trial court shall be chosen to insure that discovery regarding such expert witnesses will be completed not later than 60 days before the date on which the trial court reasonably anticipates the trial will commence. \*\*\* Failure to make the disclosure required by this rule or to comply with the discovery contemplated herein will result in disqualification of the expert as a witness." (107 Ill. 2d R. 220(b)(1).)

The imposition of sanctions for a party's noncompliance with Rule 220 is in the trial court's discretion, and the trial court's ruling should not be disturbed on appeal absent an abuse of discretion. *Jarmon*, 165 Ill. App. 3d at 863, 520 N.E.2d at 787.

In *Jarmon*, the plaintiff was injured when the car she was driving collided with a car driven by the defendant. (*Jarmon*, 165 Ill. App. 3d 855, 520 N.E.2d 783.) Plaintiff filed a complaint against the defendant and, at her deposition in May 1983, claimed she suffered a hip injury as a result of the accident. (*Jarmon*, 165 Ill. App. 3d 855, 520 N.E.2d

783.) The trial commenced on October 7, 1986. The next day, defendant informed plaintiff that he had an expert witness who would rebut her claim that her hip injury resulted from the accident between them. (*Jarmon*, 165 Ill. App. 3d at 862, 520 N.E.2d at 787.) The trial court barred the testimony of defendant's expert, and defendant appealed, claiming that he did not learn of the expert's testimony until the day of trial. (*Jarmon*, 165 Ill. App. 3d at 862, 520 N.E.2d at 787.) This court held that the expert's testimony was properly barred, finding that defendant's conduct did not indicate good faith, defendant had been aware of plaintiff's claim since May 1983 and never retained an expert, and the disqualification of defendant's expert was not unduly prejudicial to the defendant. *Jarmon*, 165 Ill. App. 3d at 863, 520 N.E.2d at 788.

Likewise, in *Castro v. South Chicago Community Hospital* (1988), 166 Ill. App. 3d 479, 519 N.E.2d 1069, this court held that the trial court properly barred the testimony of the plaintiff's expert, even though the trial court had not yet set a trial date when it barred the testimony. In that case, this court found no abuse of discretion, stating "that during the first eight years of litigation plaintiffs failed to consult or disclose any expert who would opine that [the defendant] was negligent." *Castro*, 166 Ill. App. 3d at 485, 519 N.E.2d at 1072-73.

■ We find this case to be similar to *Jarmon* and *Castro* and find no error in the trial court's decision barring Dr. Heller's testimony. Here, as defendant noted and the trial court found, plaintiff knew for at least 10 years that defendant would claim that the cause of Dixson's death was due to sickle cell disease. We also find that plaintiff's delay in producing Dr. Heller was not excused merely because Dr. Hollister found the cause of Dixson's death to be sickle cell trait rather than sickle cell crisis, since plaintiff was, at minimum, aware that defendant would contend that Dixson died from some manifestation of sickle cell disease, and not from the administration of Haldol. Further, as in *Castro*, plaintiff did not even retain an expert until nine years after her complaint was filed. Consequently, she cannot now claim that she exhibited good-faith compliance with Rule 220. Finally, we find that the plaintiff was not unduly prejudiced by the disqualification of Dr. Heller, since she was able to present the testimony of Dr. O'Donnell, who challenged defendant's claim that Dixson died from sickle cell trait and told the court that he believed Dixson had died from the negligent administration of Haldol.

Plaintiff's final issue on appeal is that the trial court should have granted her motion for a new trial because the court stated, in denying her motion, "[h]ad this court been a juror, it probably would not have

signed a verdict for defendant, but that is why we have juries decide these cases." Plaintiff claims that the trial court erroneously used a "manifest weight of the evidence" standard in evaluating her motion for a new trial. Plaintiff contends that the proper standard was the "preponderance of the evidence" and that the trial court would have granted her a new trial had it applied that standard.

Defendant responds that there was no evidence in the record that the trial court believed the preponderance of the evidence favored the plaintiff. Defendant also argues that plaintiff cannot now challenge the trial court's use of the manifest weight of the evidence standard, since plaintiff's post-trial motion requested a new trial and stated that the jury's verdict was against the manifest weight of the evidence. Finally, defendant contends that the manifest weight of the evidence standard is, in fact, the proper standard to apply in reviewing a motion for a new trial; thus, there was no error here.

■ In *Tedrowe v. Burlington Northern, Inc.* (1987), 158 Ill. App. 3d 438, 511 N.E.2d 798, the plaintiff there also claimed that the trial court erroneously applied the manifest weight standard to his motion for a new trial, rather than the preponderance of the evidence standard. This court, in order to clarify the confusion on this issue, held that the proper standard of review in evaluating a jury's verdict pursuant to a motion for a new trial is the manifest weight of the evidence standard. (*Tedrowe*, 158 Ill. App. 3d at 443, 511 N.E.2d at 802.) The test, then, is whether a contrary verdict is clearly evident. *Tedrowe*, 158 Ill. App. 3d at 444, 511 N.E.2d at 802.

■ Applying the manifest weight of the evidence standard to the jury's verdict here, we hold that the trial court properly denied plaintiff's post-trial motion. Although the testimony here was conflicting, there was sufficient evidence for the jury to conclude that Dixson died from sickle cell disease, rather than from the injection of Haldol. We cannot say, based on the evidence presented, that a verdict for plaintiff was clearly evident.

Accordingly, for all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McNAMARA and LaPORTA, JJ., concur.