PAMELA McQUEEN BAIRD, Plaintiff-Appellant, v. MEHDI ADELI, Defendant-Appellee (William Bennett *et al.*, Defendants).

Fourth District No. 4—90—0503

Opinion filed May 30, 1991.

Michael D. Clary, of Danville, for appellant.

Richard F. Record, Jr., and Richard C. Hayden, both of Craig & Craig, of Mattoon, for appellee.

JUSTICE SPITZ delivered the opinion of the court:

This is an appeal by the plaintiff Pamela McQueen Baird from a judgment entered in favor of defendant Mehdi Adeli following a jury trial in the circuit court of Vermilion County. Plaintiff sought to recover damages for the alleged negligence of the defendant in providing medical treatment to plaintiff for injuries to her right hand after she cut herself with a knife. Plaintiff also sued William Bennett and Lakeview Medical Center. Prior to trial, Lakeview Medical Center was dismissed as a defendant, and after Bennett was cross-examined as an adverse witness, he was also dismissed as a defendant.

On appeal, plaintiff raises four issues. These issues are: (1) whether the trial court erred by denying plaintiff's motion for voluntary dismissal; (2) whether the trial court erred by granting defendant's motion *in limine* excluding certain opinions of plaintiff's expert; (3) whether the trial court erred in admitting opinions of defendant's expert because the opinions were too speculative, were not disclosed in pretrial discovery, and violated an order *in limine*; and (4) whether the trial court erred by admitting the testimony of a physician with whom plaintiff consulted. The facts relevant to each issue will be presented as each issue is analyzed.

The first issue to be considered is whether the trial court erred by denying plaintiff's motion for voluntary dismissal. The trial court convened for a hearing on this matter on November 27, 1989. Initially the judge and the attorneys conferred regarding the number of peremptory challenges and the need for alternate jurors. However, before conducting *voir dire*, motions *in limine* were presented and considered by the trial court. Regarding what occurred following the consideration of these motions, the report of proceedings contains the following parenthetical entry:

"(The parties adjourned to open court for the voir dire, which was conducted; those proceedings not being contained herein at the request of counsel. The following proceedings were held immediately pursuant to the lunch recess, and prior to the commencement of the afternoon session of voir dire.)"

The next event recorded in the report of proceedings was plaintiff's tendering of a motion for voluntary dismissal. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1009.) The docket entry of the trial court for November 27, 1989, states that during *voir dire*, no jurors were selected. However, the trial court excused seven jurors for cause and plaintiff used two peremptory challenges. Following lunch recess, plaintiff moved for a voluntary dismissal. Over objections, the motion was allowed pending reimbursement of costs to the defendants then in the case. The jury was excused, but was to return at 1:30 p.m. on November 28, because there was no agreement as to the costs.

On November 28, the trial court indicated that, after considering the opinion of this court in *Cummings v. Simmons* (1988), 167 Ill. App. 3d 544, 521 N.E.2d 634, the trial court was inclined to reverse the earlier ruling on the motion for voluntary dismissal. After hearing further arguments of counsel, the trial judge did reverse the earlier ruling and the cause proceeded to jury selection.

On appeal, plaintiff's argument is, essentially, that while she does not disagree with the rules of law announced in *Cummings* and in *Kahle v. John Deere Co.* (1984), 104 Ill. 2d 302, 472 N.E.2d 787, as the law is applied to the facts of this case, plaintiff's motion for voluntary dismissal should have been granted. Plaintiff argues no trial started here because no jurors were examined *and* sworn. The rules of law set forth in *Cummings* are these:

"The sole issue presented for review is whether trial had begun for purposes of section 2—1009. Plaintiff essentially argues trial begins when evidence is presented. Defendants contend jury selection is part of trial.

Voluntary dismissal is governed by section 2—1009 of the Code, which states:

'Voluntary dismissal. (a) The plaintiff may, at any time before trial or hearing begins, upon notice to each party who has appeared or each such party's attorney, and upon payment of costs, dismiss his or her action or any part thereof as to any defendant, without prejudice, by order filed in the cause. Thereafter the plaintiff may dismiss, only on terms fixed by the court (1) upon filing a stipulation to that effect signed by the defendant, or (2) on motion specifying the

ground for dismissal, which shall be supported by affidavit or other proof. After a counterclaim has been pleaded by a defendant no dismissal may be had as to the defendant except by the defendant's consent.

·(b) Counterclaimants and third-party plaintiffs may dismiss upon the same terms and conditions as plaintiffs.' Ill. Rev. Stat. 1985, ch. 110, par. 2—1009.

This statute and its former version, section 52 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 52), were designed to correct abuses possible under a predecessor statute, which allowed a plaintiff who feared an unfavorable result to voluntarily dismiss the proceedings at any time before the jury retired or, in a bench trial, before the case was submitted for decision. (Ill. Rev. Stat. 1931, ch. 110, par. 70; see *In re Marriage of Wright* (1980), 92 Ill. App. 3d 708, 711, 415 N.E.2d 1196, 1199.) The legislative history of section 52 of the Civil Practice Act indicates the section, as originally drafted, permitted plaintiff to dismiss his action as of right no later than the time of defendant's answer or motion attacking the complaint. (See Comment, *The Vanishing Right of a Plaintiff to Voluntarily Dismiss His Action,* 9 J. Marshall J. Prac. & Proc. 853, 855 n.8 (1976).) Although the Senate approved this version, the House amended the section to require that the motion be made before trial or hearing begins. (58th Ill. Gen. Assem., House Journal, 1933 Sess., at 1010.) The resulting statute reflected a compromise between two views: the view that a plaintiff has an unfettered ability to dismiss his case, and the view that the inconvenience and expense suffered by a defendant can thwart a plaintiff's right of dismissal. *In re Marriage of Wright* (1980), 92 Ill. App. 3d 708, 711, 415 N.E.2d 1196, 1199.

The right of a plaintiff to voluntarily dismiss his case is absolute once he complies with section 2—1009. (*Kern v. Peabody Coal Co.* (1987), 151 Ill. App. 3d 807, 502 N.E.2d 1322.) Whether a trial or hearing has begun is not a matter of discretion but a substantial legal question which determines whether the court erred by not deciding if any conditions should have been imposed on the dismissal. *Kahle v. John Deere Co.* (1984), 104 Ill. 2d 302, 472 N.E.2d 787.

The Code does not define the term 'trial.' In determining whether trial has begun for purposes of section 2—1009, Illinois courts have looked to certain factors. In *Gilbert v. Langbein* (1951), 343 Ill. App. 132, 98 N.E.2d 140, voluntary dismissal

was ruled inappropriate where jury selection and an opening statement had been made. Voluntary dismissal was ruled inappropriate after the jury had been examined and sworn in *Wilhite v. Agbayani* (1954), 2 Ill. App. 2d 29, 118 N.E.2d 440.

In *Cosmopolitan National Bank v. Goldberg* (1959), 22 Ill. App. 2d 4, 159 N.E.2d 1, the court combined the *Gilbert* and *Wilhite* rationales. In *Cosmopolitan*, the parties appeared ready for trial on the scheduled date. While jurors were being summoned, counsel and the judge discussed the litigation in chambers. As a result of this discussion, the court gave the defendant 10 days in which to file an amended affidavit, and plaintiff was given 10 additional days in which to reply. Within this period, plaintiff appeared in court with a motion to voluntarily dismiss without prejudice. The court granted the motion. In determining that trial had not begun, the court stated the mere summoning of the jury did not constitute a trial. However, if jurors were examined and sworn, and plaintiff's counsel had made an opening statement, trial had begun. Since none of these events had occurred, dismissal was proper. See also *Jost v. Hill* (1964), 51 Ill. App. 2d 430, 201 N.E.2d 468 (since dismissal was requested prior to jury selection, voluntary dismissal of two counts of the complaint was proper).

The supreme court adopted the *Cosmopolitan* reasoning in *Kahle v. John Deere Co.* (1984), 104 Ill. 2d 302, 472 N.E.2d 787. On the trial date, motions were heard during the morning session. After a noon recess, and before the jury had been selected, plaintiff moved for voluntary dismissal under section 2—1009. In rejecting the defendant's argument that trial had begun when the preliminary motions were heard, the supreme court looked to the fact that no jury had been selected, no prospective jurors had been examined or sworn, and counsel had made no opening statement in determining trial had not begun. See also *Lighthart v. Pevsner* (1987), 157 Ill. App. 3d 66, 510 N.E.2d 84 (granting of motion for voluntary dismissal was proper when made before *voir dire*).

While no case addresses whether a panel of four jurors constitutes a jury for purposes of section 2—1009 analysis, we need not determine whether a jury existed, since *Kahle* states that the examination of prospective jurors is an indicator trial has begun. It is clear from the record that the proceedings on July 27, 1987, concerned the examination and swearing in of ju-

rors. Under the rationale of *Kahle,* trial had begun when plaintiff moved to dismiss her case July 28.

As a practical matter, jury selection can take days, weeks, or months. To allow plaintiff to dismiss her cause of action after *voir dire* has begun and before all 12 jurors are sworn in can result in abuse analogous to that designed to be corrected by section 2—1009. Under plaintiff's theory, a plaintiff who had expended all his peremptory challenges could move for voluntary dismissal in the later stages of jury selection if the remaining jurors were not to his liking. This would result in a waste of judicial resources as well as the resources of the parties. While inconvenience may occur in our adversary system (*Kahle,* 104 Ill. 2d at 305, 472 N.E.2d at 789), we are not persuaded the legislature intended that section 2—1009 should cause this kind of result.

Plaintiff cites in support of her position a number of cases outside this jurisdiction. We need not consider those cases, as they arise under statutory provisions different from that in effect in this State. Our legislature may wish to consider amending section 2—1009 to provide guidance in future cases." *Cummings,* 167 Ill. App. 3d at 546-48, 521 N.E.2d at 635-37.

In *Cummings,* this court relied on the waste of judicial resources as the rationale for denying the motion for voluntary dismissal. This reasoning is no less persuasive where the jury selection process has begun, even though no jurors have actively been sworn. Therefore, it is logical that trial is deemed to begin when the jury selection process begins. Plaintiff's interpretation of *Kahle* as holding trial commences only when jurors are sworn is not supported by a reading of *Kahle.* In *Kahle,* the court relied on the fact no jurors had been examined "or" sworn. In the case at bar, the trial court did not err by denying plaintiff's motion for voluntary dismissal.

The next issue to consider is whether the trial court erred by granting defendant's motion *in limine* excluding certain opinions of plaintiff's expert. Prior to trial, defendant filed a motion *in limine* which requested, in part, that plaintiff's expert, Marshall Patullo, an orthopedic surgeon, be barred from rendering any opinions contrary to those previously expressed in his discovery deposition or written report. As defendant's counsel argued, he was particularly concerned with any change in the expert's opinion regarding treatment of the fourth and fifth fingers of plaintiff's right hand.

At trial, the plaintiff made the following offer of proof:

"Q. [Plaintiff's attorney]: Doctor, do you have an opinion based upon a reasonable degree of medical and surgical certainty as to whether Dr. Adeli's failure to institute physical therapy at a time prior to March 25, 1983, was a breach of the standard of care of orthopedic surgeons?

\* \* \*

A. I do have an opinion.

Q. What is that opinion?

A. My opinion is that Dr. Adeli's failure to institute any kind of motion, physical therapy or any other kind of motion that I can find, was a breach of a standard, since it is well known that flexor tendon injuries are prone to scarring; and the earlier the motion can be instituted the less likely it is for those adhesions to form.

Q. Doctor, do you have an opinion based upon a reasonable degree of medical and surgical certainty as to whether Dr. Adeli's failure to institute physical therapy for the little finger of Pam's right hand prior to March 25, 1983 was a breach of the standard of care of an orthopedic surgeon?

A. I believe that the failure to get those fingers moving—now you use the specific phrase physical therapy, that implies another party working those hands. The important thing is motion, and that motion is something that the patient herself should have been instructed to do. Physical therapy is also important, and I think that that should have been instituted longer. I believe that there is some latitude as to the period of time, and that's primarily dependent upon the patient, upon a surgeon's judgment as to the integrity of the repair that he has made.

Q. All right. Doctor, do you have an opinion based upon a reasonable degree of medical and surgical certainty as to whether Dr. Adeli's failure to institute a passive range of motion therapy for the little finger of Pam's right hand prior to March 25, 1983 was a breach of the standard of care required of orthopedic surgeons?

A. I do have an opinion.

Q. And what is that opinion?

A. The opinion is that that was a breach of the standard, for the reasons I have said in the answer to the previous question.

Q. The question with respect to the ring finger.

A. Correct.

Q. Do you have an opinion based upon a reasonable degree of medical and surgical certainty as to whether the failure to institute a passive range of motion therapy to Pamela McQueen's ring finger prior to March 25, 1983 caused injury or damage to her ring finger?

A. I think that I do have an opinion.

Q. What is that opinion?

A. And the opinion is that that failure contributed to the severe stiffness of the finger that necessitated additional surgery.

Q. And Doctor, do you have an opinion based upon a reasonable degree of medical and surgical certainty as to whether the failure to institute a passive range of motion therapy on Pamela McQueen Baird's right little finger prior to March 25, 1983, caused injury or damage to her right little finger?

A. I do have an opinion.

Q. And what is that?

A. The opinion is the same as it was for the fourth finger.

Q. And what do you base those opinions on?

A. Flexor tendon, especially in the finger itself, is in an area in which scar tissue can very quickly inhibit the motion of the tendon. In order for that tendon to perform its function efficiently it must glide through a tunnel. When there has been injury to that tendon, if the tendon—if the finger is allowed to be completely egressed, the tendon is not made to move in any way. The ingrowth of cells between the tendon and the sheath that immediately surrounds it acts as a binder, preventing effective motion in the future."

Attached to plaintiff's written response to the motion *in limine* were several exhibits. Exhibit A was a copy of a letter to Patullo from plaintiff's attorney dated November 14, 1989. The letter indicates Patullo was being sent transcripts of his deposition and those of Drs. Bennett, Zook, Adeli, Schrodt, and Madden. Patullo was asked to review those transcripts and the following medical records: (1) physical therapy notes from Lakeview Medical Center for May 25, 1983, through January 2, 1984; (2) Zook's office notes from August 29, 1983, through February 2, 1984, and a letter to plaintiff's attorney dated June 26, 1984; (3) Lakeview Medical Center records from March 2 to March 4, 1983; (4) Adeli's office notes from March 7 through April 4, 1983; (5) office notes of Dr. Bavishi from May 12 through September 20, 1983; and (6) Memorial Medical Center records for hospitalizations on October 12, 1983, February 8, 1984, and May 17, 1984.

Exhibits B, C, and D were photocopies of portions of the July 28, 1987, discovery deposition of Patullo, which included the following testimony:

"Q. With regard to any follow-up care and treatment rendered by Dr. Adeli to the small finger, was there any deviation from acceptable medical practice?

A. I am trying to find, and maybe one of you could help me, the physical therapy notes to indicate when physical therapy was started.

Q. They are right here, here is the physical therapy, May 13, I think. You may need Adeli's too.

A. That is what I was looking for. May we go off the record? (Brief discussion off the record)

A. Mr. Hayden, I think that I felt that Dr. Adeli failed to institute physical therapy as early as it would seem reasonable to do. Now, I hesitate, I am hesitating slightly in saying that, because there is certainly some judgment to be used, depending on the physician's assessment of how secure a repair has been made, but it is well recognized by all ***. [The remainder of Patullo's answer is not included in the exhibit.]

* * *

Q. Can you state within a reasonable degree of medical certainty that the failure to institute physical therapy prior to March 25 caused injury or damage to Pamela McQueen's fifth finger?

A. I can't say that with certainty.

Q. These are only possibilities to you, as I understand your prior testimony, they are not probabilities?

A. I think they are deviations from the average that would be followed in such cases. I don't think that these are overt negligence.

Q. Okay, and concerning still the fourth finger, was there any act or omission to act on the part of Dr. Adeli that caused injury or damage to Pamela McQueen's fourth finger?

A. The same answers as were given in the care of the fifth finger, and that is, the failure to institute physical therapy in what I believe to be an appropriate time interval."

Exhibit E was an affidavit of plaintiff's counsel, which stated as follows:

"2. Dr. Marshall Patullo Grand Rapids, Michigan has been retained by the Plaintiff as an expert witness in this case.

3. Dr. Patullo's discovery deposition was taken on July 28, 1987 with all parties participating. After that, counsel for Plaintiff did not have occasion to discuss Dr. Patullo's opinions with him until preparation for the start of this trial.

4. On November 14, 1989 I sent Dr. Patullo a copy of the documents of importance in this case for him to review.

5. Because of our schedules and the Thanksgiving holiday, I was not able to confer specifically again with Dr. Patullo regarding his opinions until November 26, 1989 at approximately 10:00 a.m.

6. At that time Dr. Patullo informed me that he no longer believed the failure of Dr. Adeli to institute physical therapy was just a deviation from the average but that after a review of those documents he could state that in his opinion it was a breach of standard of care.

7. I did not know he was going to express that change of opinion until he so informed me at that time."

Bennett's deposition was scheduled for September 18, 1987, Adeli's deposition on June 10, 1986, Madden's on September 9, 1988, and Schrodt's on September 29, 1988. While plaintiff's attorney wrote to Patullo on July 24 and October 13, 1989, plaintiff's attorney did not submit transcripts of those depositions to Patullo at that time. Moreover, a letter dated June 11, 1986, establishes the experts' involvement in this case over 2½ years before trial. Defendant submitted interrogatories to plaintiff pursuant to Illinois Supreme Court Rule 220 (134 Ill. 2d R. 220) on March 29, 1985, and supplemental interrogatories pursuant to Rule 220 on August 14, 1986. In arguing the motion *in limine*, defendant's attorney stated additional Rule 220 interrogatories were sent in July 1989 and on February 29, 1988. According to plaintiff's attorney, in answering interrogatories concerning Patullo's opinion, plaintiff merely referred to Patullo's deposition. However, neither the interrogatories nor the answers thereto are included in the record on appeal.

In granting the motion *in limine*, the trial court noted the purpose of the rule was to provide for timely and appropriate disclosure of opinions so as to allow the opposing party an opportunity to fully explore those opinions. The trial court concluded the eve of trial was too late for plaintiff to disclose a change in Patullo's opinion.

Rule 220 states, in pertinent part:

"(b) Disclosure.

(1) *Expert witness.* Where the testimony of experts is reasonably contemplated, the parties will act in good faith to seasonably:

 (i) ascertain the identity of such witnesses, and

 (ii) obtain from them the opinions upon which they may be requested to testify.

In order to insure fair and equitable preparation for trial by all parties the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party either within 90 days after the substance of the expert's opinion first becomes known to that party or his counsel or, if the substance of the expert's opinion is then known, at the first pretrial conference in the case, whichever is later. In any event, as to all expert witnesses not previously disclosed, the trial court, on its own motion, or on the motion of any party after the first pretrial conference, shall enter an order scheduling the dates upon which all expert witnesses, including rebuttal experts, shall be disclosed. The schedule established by the trial court will sequence the disclosure of expert witnesses in accordance with the complexities of the issues involved and the burdens of proof of the respective parties as to those issues. All dates set by the trial court shall be chosen to insure that discovery regarding such expert witnesses will be completed not later than 60 days before the date on which the trial court reasonably anticipates the trial will commence. Upon disclosure, the expert's opinion may be the subject of discovery as provided in paragraph (c) hereof. Failure to make the disclosure required by this rule or to comply with the discovery contemplated herein will result in disqualification of the expert as a witness.

 ***

(c) Discovery.

(1) Upon interrogatory propounded for that purpose, the party retaining or employing an expert witness shall be required to state:

 (i) the subject matter on which the expert is expected to testify;

 (ii) his conclusions and opinions and the bases therefor; and

 (iii) his qualifications.

 ***

(3) A party shall be required to seasonably supplement his answers to interrogatories propounded under this rule as additional information becomes known to the party or his counsel.
***

(d) Scope of Testimony. To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through interrogatories, depositions or requests to produce, his direct testimony at trial may not be inconsistent with [n]or go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings. However, he shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." 134 Ill. 2d Rules 220(b), (c), (d).

 The purpose of Rule 220, generally, is to promote the timely and good-faith pretrial disclosure of expert witnesses to prevent surprise and to facilitate pretrial investigation of credentials of the expert and preparation of cross-examination as well as the substance of the testimony of the opposing party's own expert. (*Dixson v. University of Chicago Hospitals & Clinics* (1989), 190 Ill. App. 3d 369, 546 N.E.2d 774; *Phelps v. O'Malley* (1987), 159 Ill. App. 3d 214, 511 N.E.2d 974; *McDonald's Corp. v. Butler Co.* (1987), 158 Ill. App. 3d 902, 511 N.E.2d 912.) When the trial court has imposed sanctions for noncompliance with Rule 220, the trial court's ruling will not be upset in the absence of a showing that the ruling resulted from an abuse of discretion. *Dixson*, 190 Ill. App. 3d 369, 546 N.E.2d 774.

 However, each subsection of the rule has a different function. Whereas Rule 220(b) allows a trial court to establish a disclosure schedule so as to disqualify an expert who is not properly disclosed, Rules 220(c) and (d) require timely notification of shifts in an expert's theory or belief and the limiting of the expert's testimony accordingly.

A clear example of how Rules 220(c) and (d) work can be seen by comparing *Singh v. Air Illinois, Inc.* (1988), 165 Ill. App. 3d 923, 520 N.E.2d 852, and *Stringham v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 312, 536 N.E.2d 1292. In *Singh*, the court held that merely because the expert updated his original report on the present-value calculation of decedent's earning capacity in a wrongful death action did not prevent the expert testifying to same since the expert's revisions did not involve a shift in theory or belief and the same methodology and tables were used to update the original report. In *Stringham*, however, the trial court properly barred the expert from testifying as to the present value of decedent's *future earnings* in a

wrongful death action where it was earlier disclosed that the expert's testimony was to relate to the present value of *future cost of support.*

■■ In this case, plaintiff's attorney withheld from plaintiff's witness, until shortly before trial, medical evidence and testimony. Based on the review of those documents, Patullo changed his opinion. Some of the withheld evidence and testimony was available when the expert was deposed, and the remaining evidence and testimony was available for review at a time considerably in advance of plaintiff's attorney's request for such review by plaintiff's expert. The trial court could reasonably determine that the plaintiff's attorney utilized a procedure to avoid the Rule 220(c) requirement of ongoing disclosure of shifts in the expert's opinion testimony. The trial court barred the expert from testifying in a manner inconsistent with his deposition testimony. No abuse of discretion has been demonstrated.

The four cases cited to this court by plaintiff are clearly distinguishable. *Illini Aviation, Inc. v. Walden* (1987), 161 Ill. App. 3d 345, 514 N.E.2d 551, involves not a change in the expert's testimony, but instead the nondisclosure of an expert witness. Therefore, it is Rule 220(b) and not Rules 220(c) and (d) which are applied in *Illini Aviation. McGuckin v. Chicago Union Station* (1989), 191 Ill. App. 3d 982, 548 N.E.2d 461, also involves the question of nondisclosure of experts, and more specifically whether the witnesses were "retained to render an opinion at trial." As a result, the reasoning in *McGuckin* has no application to the present case. In *Crawford County State Bank v. Grady* (1987), 161 Ill. App. 3d 332, 514 N.E.2d 532, this court considered the question of whether sufficient prejudice requiring reversal had been demonstrated where the trial court allowed an expert to testify in spite of a discrepancy between the testimony at trial and the expert's written report. This court found no prejudice was demonstrated since the testimony was merely cumulative to other competent testimony. Merely because no prejudice was demonstrated in *Crawford County State Bank* does not necessarily require a finding in the case at bar that the trial court erred by refusing to allow in the objectionable testimony. Nor does the cited case of *Mazur v. Lutheran General Hospital* (1986), 143 Ill. App. 3d 528, 493 N.E.2d 62, support plaintiff's position. In *Mazur*, a defense expert was allowed to answer a hypothetical question at trial inconsistent with testimony given in a deposition because the expert was not previously aware of an addendum to the initial pathological report and because plaintiff did not inquire with respect to such evidence at the deposition. *Mazur* is somewhat troubling for these reasons: (1) the addendum to the pathology report was prepared on November 2, 1983; and (2) a copy of the ad-

dendum was sent to the expert by defendants' attorneys only two days before trial started. However, there is no indication in the opinion of when the addendum came into the possession of the defense attorney. The court noted that defendants' counsel had only become aware of the witness' prepared answer to the hypothetical question the night before the witness was to testify, and suggested there would have been a different result had defendants elicited the pathologist's testimony such that it might be argued the addendum was deliberately withheld to plaintiff's prejudice. Furthermore, the argument that the answer to the hypothetical question was inconsistent with the deposition testimony was deemed waived because plaintiff's counsel objected to the withdrawal of the question and answer and cross-examined on it. Therefore, the cases cited by plaintiff do not require this court to find an abuse of discretion in the instant case.

The third issue under consideration is whether the trial court erred in admitting opinions of defendant's expert because the opinions were too speculative, were not disclosed in pretrial discovery, and violated an order *in limine.* Joseph Schrodt, an orthopedic surgeon, testified on behalf of defendant. During the direct examination of Schrodt, the following exchange occurred:

"Q. [Defense Counsel] Doctor, do you have an opinion within a reasonable degree of medical certainty as to whether or not on March 25, 1983 when Dr. Adeli last saw this patient, there was a profundus tendon function in the right middle finger?

A. I do have.

Q. What is your opinion?

A. There was.

Q. Doctor, have you subsequently learned in your review of records that there was a repair of the profundus tendon in the middle finger?

A. Yes.

Q. Doctor, do you have an opinion based upon your review of medical records in this case as to whether or not there was any event or events which occurred in Pamela McQueen's treatment that would explain the severance of the tendon?

A. I'm not aware of any events of treatment that would be related to that.

Q. Were there any events that would not constitute treatment that in your opinion might or could have severed the tendon in the middle finger?"

To this question, plaintiff's counsel interposed an objection on the ground that the question asked the witness to speculate. Initially, the

objection was sustained, but after a side-bar conference, the trial judge stated she would allow defense counsel to inquire about the witness' opinion as to causation to a reasonable degree of medical certainty. Thereafter, the direct examination of Schrodt continued as follows:

> "Q. Doctor, do you have an opinion based upon a reasonable degree of medical certainty that would explain, sir, how the tendon could have been severed and repaired subsequently, and not be present during the examination by Doctors Adeli and Bennett? Do you have an opinion, sir?
>
> A. I do have.
>
> Q. What is your opinion?
>
> [Plaintiff's counsel]: Your Honor, please register my objection again to that question.
>
> THE COURT: I will overrule the objection.
>
> Q. What is your opinion, sir?
>
> A. There is a possibility.
>
> Q. What is that, sir?
>
> A. There was in the physical therapy notes record of an altercation in which the Plaintiff sustained injuries, including facial injuries, rib fractures, and could have possibly injured the tendon in that event.
>
> Q. Was there function in the middle finger prior to that incident you've just described?
>
> A. There was in the records of the hospital record that I have previously talked about.
>
> Q. And was there function in the middle finger, profundus function to the DIP joint following that incident you've described?
>
> A. No.
>
> Q. Do you know the date of that incident, sir?
>
> A. It was the last part of May, I believe, but I would have to look at those records again. I'm not sure.
>
> Q. And that would be 1983?
>
> A. Yes, sir."

Plaintiff neither objected to nor moved to strike the witness' testimony. Instead, plaintiff attempted to challenge that testimony through cross-examination of the witness:

> "[Plaintiff's attorney]: Dr. Schrodt, the incident that you referred to in the end of May, 1983, from your review of the record, there was no statement of any kind in the record any-

where which indicated the long finger of Pam's right hand had been cut at that time, is there?

A. No, sir, that's correct.

***

Q. Dr. Bavishi made a physical examination of the Plaintiff, Pam McQueen Baird, on May 12, 1983 didn't he?

A. Yes, he did.

Q. With respect to his examination of her middle finger or long finger at that time he stated or found that there was no active flexion at the distel interphalangeal joint at that time, didn't he?

A. Yes, he did.

Q. That would be the end joint of her right long finger?

A. That's correct.

Q. That meant he found no ability in her to move that finger at that joint on her own?

A. That's correct.

Q. You also indicated that you reviewed the physical therapy notes from Pam's treatment?

A. That's correct.

Q. Did you examine the physical therapy record from May 13, 1983?

A. I examined all those. Some of those are not very good copies, but I did examine all of those records, yes, sir.

Q. On May 13, 1983, when the physical therapist performed an evaluation of the motion of the end joint of Pam's long finger, and that there was no active flexion at that joint, didn't she?

A. Yes."

Plaintiff raises three contentions concerning the testimony. First, plaintiff argues the testimony is speculative and should not have been allowed. Second, she argues this testimony violates Rule 220, because Schrodt testified in his discovery deposition as follows: "It was discovered later that the tendon was not intact, but there's no actual time that one can say that the complete severance actually occurred." Plaintiff's third argument is that the testimony violates an order *in limine* precluding testimony regarding injuries to plaintiff suffered to parts of her body other than her right hand on dates other than March 2, 1983.

■ The third contention can be most easily disposed of because there was no order *in limine*. Instead, the trial judge made the following statement:

"So what I will do is, after the plaintiff has testified, when you wish to get into a line of inquiry along this line about these prior events, then if you approach the bench and tell me when you are about ready to do it, and at that point we can, I think, more accurately determine whether or not it's appropriate."

There was a side bar prior to the testimony in question and it was obvious from the arguments of counsel that defendant was going to inquire into some cause of injury other than treatment.

■■ Furthermore, plaintiff has waived this contention for purposes of review. In order to save a contention for review, a proper objection must be made. To be effective, the objection must specifically state the grounds for exclusion unless the ground is obvious from the context. Where a specific objection is made, all grounds not specified are waived. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §103.2 (5th ed. 1990).

■■ In the case at bar, plaintiff objected on the specific grounds that speculation was required of the witness. No objections having been made on the grounds that the testimony violated Rule 220 or violated an order *in limine*, these contentions are waived. The defendant also argues that plaintiff's contention regarding speculation by the witness is also waived because, after the objection was overruled, plaintiff proceeded to cross-examine the witness. Defendant relies on *Mazur*. However, in *Mazur* there was an election by counsel to proceed to cross-examine after opposing counsel offered to withdraw the objected to testimony. No election being present here, once the court has overruled an objection, the objecting party may cross-examine the witnesses. However, after cross-examining the witness, which cross-examination, according to plaintiff, further demonstrated the witness was speculating, plaintiff did not renew her objection, move to strike the offensive testimony, and request the court to direct the jury to disregard it.

■■ On the merits, it is permissible for an expert to testify concerning the expert's opinion in terms of possibilities or probabilities (*Nicholas v. City of Alton* (1982), 107 Ill. App. 3d 404, 437 N.E.2d 757; *Presswood v. Morris* (1979), 70 Ill. App. 3d 513, 388 N.E.2d 844), but the opinion of a medical expert must be based on a reasonable degree of medical certainty. (*Collins v. Straka* (1987), 164 Ill. App. 3d 355, 517 N.E.2d 1147.) Nevertheless, an expert may not guess, surmise, or conjecture as to a possible cause for the injury based on matters which could not be shown to have existed. For example, in *Kanne v. Metropolitan Life Insurance Co.* (1941), 310 Ill. App. 524, 34 N.E.2d 732, a physician was not allowed to testify that

death might have resulted from chronic myocarditis instead of drowning where there was no evidence the decedent suffered from any such illness and the inference was based on the fact the body was floating only partially submerged. In *Gariti v. Karlin* (1970), 127 Ill. App. 2d 166, 262 N.E.2d 179, the doctor's opinion that a diabetic could lose control of an automobile was considered speculative because there was no evidence the motorist in question was a diabetic before the accident, the diabetic condition was severe enough to cause loss of coordination, or the motorist's vehicle in fact crossed the centerline before the collision. In *Coffey v. Brodsky* (1987), 165 Ill. App. 3d 14, 518 N.E.2d 638, a physician could not speculate, in a medical malpractice action, that there was thickening of the peritonium and a resultant lack of pliability which would have contributed to injury in absence of negligence where there was no medical evidence that such thickening of the peritonium and lack of pliability was observed during surgery.

In the case at bar, the facts upon which the expert's opinion was based did exist. There was a fight in which plaintiff became injured. However, the record does not disclose any medical reports or testimony which conclusively established that the fight caused a second injury to plaintiff's hand. The expert should, therefore, not have been allowed to opine that this fight could have caused an injury to plaintiff's hand which defendant did not observe previously. In any event, plaintiff's cross-examination of Schrodt clearly brought to the jury's attention the fact that the medical records do not disclose a subsequent injury. Furthermore, the jury could infer and defendant's counsel could argue that the finger was injured in the fight because, otherwise, defendant would have observed the lack of motion. Such an argument and inference are available by resort to common experience and need not require an expert to opine that a second injury occurred during the fight. For these reasons, we find that no reversible error occurred as a result of Schrodt's testimony.

The final contention to consider on the merits is whether Schrodt's testimony violated Rule 220(d). As has already been discussed, Rule 220(d) prohibits an expert from testifying inconsistent with or going beyond facts or opinions discussed in discovery unless inquiry had not been made in discovery regarding the subject matter of the trial testimony. For this reason, in *Bart v. Union Oil Co.* (1989), 185 Ill. App. 3d 64, 540 N.E.2d 770, a pathologist was not allowed to testify that decedent might have survived the initial explosion and suffered pain prior to death where the pathologist previously stated during discovery that he could not opine, based upon a reason-

able degree of medical certainty, whether decedent suffered any conscious pain and suffering.

 Defendant suggests there is a distinction between saying at deposition, "there's no actual time that one can say that the complete severance actually occurred" and the trial testimony concerning the "possibility" another incident caused the severance of the tendon. Technically, defendant is correct. And, certainly, plaintiff could have explored the possibilities and probabilities of other causes for the complete severance of the tendon.

Defendant's cited cases demonstrate little, if any, support for defendant's position. In *Caruso v. Pine Manor Nursing Center* (1989), 182 Ill. App. 3d 879, 538 N.E.2d 722, the court held that an expert's testimony could not be entirely barred where only a portion of the expert's testimony exceeded the scope of matters developed in the deposition. Therefore, to suggest, as does defendant, that had the trial court barred Schrodt's testimony on this line of questioning, reversible error would have occurred based on the reasoning in *Caruso* is incorrect. In *Georgacopoulous v. University of Chicago Hospitals & Clinics* (1987), 152 Ill. App. 3d 596, 504 N.E.2d 830, the objectionable portion of the expert's testimony was admitted only to explain earlier testimony and did not form the basis of the witness' expert opinion. As a result, Rule 220 was not violated. In *Northern Trust Co. v. St. Francis Hospital* (1988), 168 Ill. App. 3d 270, 522 N.E.2d 699, the court compared the deposition and trial testimonies of the witness and found no inconsistency existed. Defendant does not argue there is no inconsistency in the case at bar, but that plaintiff failed to inquire at the deposition concerning matters later disclosed at trial. Defendant cites *Northern Trust*, as an example of the type of question plaintiff could have asked at the deposition in order to avoid surprise at trial. In *Northern Trust*, the expert was asked about the decedent's chances for survival had he been admitted to the hospital at his first visit at 1:30 a.m. and at the time of his admission to the hospital, at 6:30 a.m. The expert couched his answers in terms of percentages. Nevertheless, had the issues not been waived in the instant case, no reversible error occurred.

The final issue to be considered is whether the trial court erred by admitting the testimony of a physician with whom plaintiff consulted. Plaintiff objected to the testimony of Dr. John William Madden, of Tucson, Arizona, on the grounds that Madden's testimony could only relate to the "aftercare" of plaintiff's ring and little fingers since he saw plaintiff after Dr. Elvin G. Zook surgically set the dip joint of plaintiff's middle finger so there would be no range of motion therein.

Plaintiff argues if the only issue in this trial pertained to plaintiff's middle finger, and not the other fingers, then Madden's testimony would be irrelevant.

Madden described his examination of plaintiff's right hand, including the thumb and index finger, both of which he found to have normal motion and feeling. He then went on to discuss his findings concerning the remaining three fingers. Plaintiff complained to him of an inability to use her hand in the way she wanted. However, she was vague about this, and when patients are vague regarding the types of functions which cannot be performed, it is critical to specifically define these functions. Therefore, plaintiff was to take very specific notes of her daily activities for two weeks and return to the therapist. In line with this recommendation, Madden made an appointment for her at the Hand Therapy Group in Tucson. However, plaintiff did not follow through with the recommended program.

■ Plaintiff complains that this testimony is prejudicial to her by creating an inference that the failure to follow up on Madden's program contributed in some way to her condition. As that may be, the trial court properly allowed the evidence deposition to be presented over plaintiff's objection. Defendant agreed at trial that, if the only issue concerns the dip joint of plaintiff's middle finger and the remainder of the middle finger is normal as to sensation and motion, the deposition was unnecessary. Obviously, plaintiff did not concede that point. And while it is true that some of Madden's testimony concerns his examination of injured fingers for which injuries no issue at trial related, plaintiff cannot have the entire deposition withheld from evidence merely because a portion of it is irrelevant. Nor do we agree with plaintiff's assumption that Madden must have been concerned only with the functioning of the ring and little finger. His concern was the use of the entire hand, including the middle finger.

■ Evidence may be admitted if it is relevant to a disputed issue and its prejudicial effect does not substantially outweigh its probative value. Evidence is relevant if it tends to make more or less probable the existence of any fact which is of consequence to the determination of the action. It is the trial court's function to weigh the probative value and prejudicial effect of the evidence in determining whether the evidence should be admitted. Once the trial court has made an evidentiary ruling, that ruling will not be overturned on appeal unless it is clearly shown to have resulted from an abuse of discretion. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 568 N.E.2d 864.) Clearly, the failure of plaintiff to follow up Madden's program is relevant to whether any alleged failure of plaintiff's hand to properly

function, including her middle finger, is due to plaintiff's failure to follow up on a recommended program of care as opposed to any negligence by defendant.

For the foregoing reasons, the judgment of the circuit court of Vermilion County is affirmed.

Affirmed.

LUND, P.J., and McCULLOUGH, J., concur.