PHILLIP MATUSZAK et al., Plaintiffs-Appellants, v. GERALD CERNIAK et al., Defendants-Appellees.

Third District   No. 3—02—0320

Opinion filed February 25, 2004.

David A. Novoselsky and Leslie J. Rosen (argued), both of David A. Novoselsky & Associates, of Chicago, for appellants.

Daniel P. Slayden, of Hinshaw & Culbertson, of Joliet, and Joshua G. Vincent (argued), of Hinshaw & Culbertson, of Chicago, for appellee St. Joseph Hospital.

Pamela D. Gorcowski (argued), of Rooks, Pitts & Poust, of Joliet, for appellee Gerald Cerniak.

JUSTICE McDADE delivered the opinion of the court:

Plaintiff, Phillip Matuszak, brought a medical malpractice action against his treating physician and hospital for damages allegedly sustained during a colonoscopy procedure. The trial court entered judgment on a jury verdict for defendants, and plaintiff timely appealed. In this appeal, plaintiff presents only one issue for review: whether the trial court committed reversible error in allowing defendant's expert witness to render speculative opinions regarding the possible causes of his injury. We find the court did not err and we affirm.

## FACTS

This present lawsuit arises from plaintiff's 1996 colonoscopy involving the use of the drug Versed. The record reveals that in July of 1996, plaintiff developed abdominal cramping and had blood in his

stools. After he had been evaluated by his family physician, it was recommended that he undergo a colonoscopy in order to further assess his digestive tract.

Colonoscopy is a procedure in which a flexible, lighted instrument connected to a video screen is inserted into the rectum and moved around to permit examination of a patient's large intestine. Plaintiff's colonoscopy was performed on July 26, 1996, by Dr. Gerald Cerniak at St. Joseph's Medical Center.

Prior to the procedure, Dr. Cerniak ordered the administration of three drugs, Demerol, Phenergan and Versed, to induce conscious sedation, calming and anti-nausea effects to reduce patient discomfort during the procedure. Versed, which acts directly on the patient's central nervous system, causes respiratory depression, which in turn could lead to hypoxia, a lack of oxygen in the blood.

During the procedure, the monitoring of oxygen saturation after the administration of Versed is a critical function, since a patient whose blood oxygen drops below a certain level for even a short period of time can suffer brain damage, and possibly death. Along with other devices for monitoring his vital signs, a pulse oximeter, a device attached to the patient's finger, was used during plaintiff's colonoscopy to record pulse as well as to determine oxygen saturation in the blood. The oximeter sounds an alarm if the blood oxygen falls below the critical 90% level.

Judy Dunham and Barbara Scott, registered nurses employed by St. Joseph's Medical Center, monitored Matuszak's vital signs and oxygen saturation level at specific intervals during the colonoscopy. The first notation that the nurses made on plaintiff's medical chart showed that at 10:50 a.m., plaintiff had been given 75 milligrams of Phenergan and 50 milligrams of Demerol. A five-milligram dose of Versed was administered at 11:55 a.m. Plaintiff's chart showed that he had an oxygen saturation level of 98% at that time, a reading in the upper range of normal. At noon, plaintiff received another five milligrams of Versed; his oxygen saturation was recorded at 90%, the lowest point within the normal range. By 12:15 p.m., his blood oxygen had risen to 96%, and it remained at that level until the procedure was completed at 12:25 p.m. There was no evidence that the pulse oximeter alarm ever sounded.

Plaintiff was discharged from St. Joseph's at 1 p.m. It was shown that he had lunch at a local restaurant, visited several stores and shops, and later that evening, engaged in sexual relations with his wife. Testimony at trial indicated that such sexual activity is not possible within 24 hours of an hypoxic event. Several days after the procedure, plaintiff became confused and disoriented, causing his wife

to worry. Plaintiff was hospitalized in mid-August 1996, after a period of confusion, lethargy, and severe headaches.

Plaintiff's wife Judy testified that plaintiff developed symptoms of confusion and disorientation immediately after the colonoscopy. She stated that plaintiff's prior medical impairments included headaches, dizziness, ear infections, and upper respiratory tract infections. Additionally, she testified that plaintiff had been using the drug Valium on a regular basis for relief from injuries he sustained in a 1968 automobile accident.

Subsequent hospital examinations revealed decreased blood flow to both sides of plaintiff's brain. A *Single Photon Emission Computed Tomography* (SPECT) scan, performed at Loyola University Medical Center, provided evidence of diminished brain activity. The scan showed diminished blood flow in the temporal lobe and parietal area of plaintiff's brain. Following the initial tests and hospitalization, plaintiff continued to exhibit the above-mentioned symptoms, plus angry outbursts, paranoia, and short-term memory problems.

He was next examined at the Mayo Clinic in Rochester, Minnesota. Doctors at the Mayo Clinic performed a differential diagnosis, which accounts for or rules out other medical conditions that may cause or contribute to plaintiff's present symptoms and complaints. This diagnosis led them to conclude that plaintiff suffers from a "cognitive dysfunction of unknown etiology."

The pertinent issue at trial was whether defendants deviated from the standard of care in failing to properly administer the appropriate amount of the drug Versed. Plaintiff therefore presented the testimony of various standard-of-care experts at trial, including Dr. William Cahill, who specializes in internal medicine and is board certified. Dr. Cahill testified that Dr. Cerniak gave plaintiff "too much Versed, which is a very dangerous drug. *** [H]e gave it too quickly. He didn't wait long enough in between the individual doses to be sure on what the effect of the drug was. He didn't know what it was. He gave it too quickly." Dr. Cahill further stated that the oxygen saturation level of 90% was below normal and subsequently caused irreversible damage to plaintiff's brain. He explained that, when a brain is deprived of oxygen, it will recover unless and until a threshold is reached, and after that time, permanent injury results. Dr. Cahill concluded that such a threshold was reached in this case.

Plaintiff next presented the testimony of Dr. William Berger, a board-certified anesthesiologist. Dr. Berger described defendants' use of the medication as "way too much" throughout the colonoscopy procedure. He also opined that a "reasonable physician" should "guard against *** giving this much Versed." He further stated that

the risk of brain injury existed in this case when plaintiff's oxygen saturation reading was recorded at 90%.

However, it appeared that plaintiff's medical experts who testified on causation could not definitely conclude that the administration of Versed on July 26 caused either an hypoxic event or plaintiff's conditions. Dr. Ronald Petersen, plaintiff's treating physician at the Mayo Clinic, informed the jury that it was unlikely that hypoxia was the cause of plaintiff's conditions. Dr. Petersen examined plaintiff's SPECT scan results and concluded "that the SPECT blood flow pattern, interpretations, are nonspecific."

Dr. Morris Fishman, plaintiff's treating physician during his hospitalization at Loyola, testified that the testing that had been performed on plaintiff could not conclusively establish the origin of his symptoms. Dr. Fishman stated that based on his examination and treatment of plaintiff, he could not find "clear evidence for any meaningful structural neurological injury. Nor could [Dr. Fishman] on the basis of the available evidence relate it to the colonoscopy in July." Both doctors relied on differential diagnosis to arrive at their conclusions. Each identified several possible causes for plaintiff's symptoms, including Alzheimer's disease, stroke, elevated urinary arsenic level, rheumatoid arthritis, depression, and an infectious disease process suggested by elevated protein levels found in plaintiff's cerebral spinal fluid. Both experts considered those alternatives and ruled them out. Having also ruled out an hypoxic event as a likely cause, both of plaintiff's treating experts reached the conclusion that plaintiff suffered from a "cognitive dysfunction of unknown etiology."

Defendants called Dr. Davidson, who also utilized differential diagnosis to develop the following opinion concerning the cause of plaintiff's conditions:

"Q. [Defense attorney]: Doctor, within a reasonable degree of medical certainty, will you share with the ladies and gentlemen of the jury what you consider to be an appropriate differential diagnosis of the condition of [plaintiff]?

A. [Dr. Davidson]: I agree with the Mayo Clinic diagnosis as cognitive dysfunction of unknown etiology. The differential includes some degenerative disease of the brain, such as Alzheimer's disease, a progressive degenerative disease and there's several types. Secondly, a static cognitive dysfunction, which is made worse by an ongoing psychiatric difficulty or emotional difficulty.

Thirdly, he was in a car accident in the 1960's, which caused a significant head injury, at least significant for them to do a number of spinal taps. Fourthly, he did have some abnormalities in his work-up that weren't entirely explained, such as high arsenic level in his urine.

He has a history of rheumatoid arthritis, which can cause brain problems, he has an unexplained elevated white count. He had an antinuclear antibody that was slightly positive, all suggesting he may have an immunological problem. Also he sees an infectious disease doctor, who's told him that he has too many infections. So he might have a problem with his immune system.

\*\*\*

Q. Now, Doctor, based upon your review of the records and the testimony, depositions in this case, do you have an opinion whether that cognitive dysfunction is related to a hypoxic episode that occurred on July 26 of 1996.

A. Yes, I have an opinion.

Q. What is that?

A. There's no evidence in any of these records that he had an hypoxic episode."

Plaintiff objected on the ground that this opinion was speculative. The trial court overruled the objection.

Dr. Davidson next explained that differential diagnosis is a standard scientific technique for identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. He made plaintiff's differential diagnosis "by reviewing the [medical records] and the transcripts of the depositions." The result of his diagnosis left some of plaintiff's conditions as possible causes of his cognitive dysfunction and ruled out hypoxia.

On cross-examination, plaintiff's trial counsel confronted Dr. Davidson with Dr. Petersen's testimony, which excluded Alzheimer's disease as a possible cause of plaintiff's symptoms:

"Q. [Plaintiff's attorney:] Am I correct that you feel one of the differential diagnoses that you have made, at least, is some progressive dementing illness, such as Alzheimer's?

A. That's a possibility.

Q. Are you aware that \*\*\* Dr. Petersen did not feel Alzheimer's was likely, yet, you disagree with that?

A. No. I don't think it's likely. It's part of my differential. If I thought anything is likely, I would say this is the diagnosis to a reasonable degree of medical certainty. I am saying that these are the possibilities. Now, I am not saying that [plaintiff] likely has Alzheimer's. I just list it as one of the possibilities."

Plaintiff filed his timely appeal, alleging that the trial court's refusal to bar Dr. Davidson's "speculative and prejudicial" testimony constituted reversible error.

## ANALYSIS

■ Generally, expert testimony is admissible if the proffered expert

is qualified as an expert by knowledge, skill, experience, training, or education and the testimony will assist the trier of fact in understanding the evidence. *Friedman v. Safe Security Services, Inc.*, 328 Ill. App. 3d 37, 765 N.E.2d 104 (2002). The decision to admit opinion testimony lies within the trial court's sound discretion, and a reviewing court will not reverse its decision absent an abuse of discretion. *Van Holt v. National R.R. Passenger Corp.*, 283 Ill. App. 3d 62, 669 N.E.2d 1288 (1996).

On appeal, plaintiff claims that the trial court should have barred Dr. Davidson from rendering any opinion regarding other possible causes of plaintiff's conditions. Plaintiff does not challenge Dr. Davidson's credentials but instead maintains that his differential diagnosis opinion was not admissible because he failed to rule out other possible causes in reaching his conclusion. We find this argument without merit.

■ It is permissible for a medical expert to testify concerning his or her opinions in terms of possibilities or probabilities. *Baird v. Adeli*, 214 Ill. App. 3d 47, 573 N.E.2d 279 (1991). The expert may testify to what might or could have caused an injury despite any objection that the testimony is inconclusive. *Geers v. Brichta*, 248 Ill. App. 3d 398, 618 N.E.2d 531 (1993). The testimony need not be based on absolute certainty, but only a reasonable degree of medical and scientific certainty. *Nowicki v. Union Starch & Refining Co.*, 1 Ill. App. 3d 92, 272 N.E.2d 674 (1971). It remains for the trier of fact to determine the facts and the inferences to be drawn from the testimony. *Mesick v. Johnson*, 141 Ill. App. 3d 195, 490 N.E.2d 20 (1986).

Our conclusion is consistent with the Illinois Supreme Court decision in *Field Enterprises v. Industrial Comm'n*, 37 Ill. 2d 335, 226 N.E.2d 867 (1967). In *Field,* the claimant's husband died while working at his employer's factory. One of claimant's medical experts opined that the cause of death was "organic heart disease of some type and that decedent died of heart failure because of it." *Field*, 37 Ill. 2d at 338. Another medical expert, however, testified that the cause of death was an acute coronary episode with a myocardial infarction. The employer's medical witness stated that a number of conditions could have caused the decedent's death in view of his medical history. The Industrial Commission found in favor of the claimant and awarded her compensation for her husband's death. On appeal, the employer argued that the Commission's finding that the decedent died of a heart attack was purely speculation and unsupported by the evidence. The employer maintained that the Commission's finding was not proper in that case because the claimant failed to present evidence to negate the other reasonable causes for the decedent's death. Our

supreme court affirmed the finding of the Commission, holding that "[t]he claimant was not required to negate every other possible cause of death to establish death by reason of a heart attack as a legitimate inference from the evidence." *Field*, 37 Ill. 2d at 339.

We are also provided direction by decisions of the federal courts addressing the precise issue raised here. In *Heller v. Shaw Industries, Inc.*, 167 F.3d 146 (3d Cir. 1999), the Third Circuit Court of Appeals held that a medical expert's causation opinion should not be excluded because he or she fails to rule out every possible alternative cause of a patient's medical problem. In *Heller*, the plaintiff brought a personal injury suit against a carpet manufacturer, alleging respiratory problems after its carpet was installed in her home. Plaintiff's medical expert was able to rule out, after conducting a differential diagnosis, various possible causes of the plaintiff's respiratory problems. He also offered a number of plausible alternative causes, including dust from other carpets, benzene and 2-butoxyethanol from other sources, and paint and new hardwood floors in the house. The trial court granted the defendant's motion to exclude the expert's testimony because he failed to rule out all alternative possible causes of the plaintiff's illness.

The circuit court reversed. Chief Circuit Judge Edward Becker, writing for the majority, reasoned: " '[T]o require the experts to rule out categorically all other possible causes for an injury would mean that few experts would ever be able to testify....' " *Heller*, 167 F.3d at 156, quoting D. Capra, *The Daubert Puzzle*, 32 Ga. L. Rev. 699, 728 (1998). Judge Becker further explained that the alternative causes suggested by the medical expert only affected the weight that the jury should give the expert's testimony and "not the admissibility of that testimony." *Heller*, 167 F.3d at 157. See also *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999) ("[A] differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion ***'").

■ In the instant case, we similarly find that the admissibility of Dr. Davidson's opinion does not depend upon his ability to disprove every possible cause of plaintiff's injury. Dr. Davidson gave his opinion, based upon a reasonable degree of medical certainty, that plaintiff's injuries were caused by an unknown etiology.

Dr. Davidson utilized the process of differential diagnosis to reach his conclusion. In performing his diagnosis, he considered several alternative causes of plaintiff's conditions including plaintiff's prior car injury, an immunological disorder, rheumatoid arthritis, or Alzheimer's disease. Dr. Davidson stated that he relied on other experts'

testimony and was aware of plaintiff's medical history. He also reviewed plaintiff's clinical test results, including the SPECT scan results and the Mayo Clinic differential diagnosis. His conclusion was, in fact, the same as that of Drs. Petersen and Fishman, two of plaintiff's own experts, even though he did not rule out all other possible causes as they did. None of them found hypoxia to be a likely cause of plaintiff's symptoms. We conclude that his testimony assisted the jury in understanding the evidence and the trial court did not abuse its discretion in admitting this testimony.

Plaintiff next argues that "there was no reliable evidence that any of these conditions caused [plaintiff's] condition." He draws our attentions to the cases of *Reed v. Jackson Park Hospital Foundation*, 325 Ill. App. 3d 835, 758 N.E.2d 868 (2001), and *Gariti v. Karlin*, 127 Ill. App. 2d 166, 262 N.E.2d 179 (1970).

In *Reed*, the trial court barred defendant's medical expert from testifying that there was a 20% chance the plaintiff's eye could have been saved had the eye injury been discovered at the emergency room rather than four days later. The appellate court affirmed, holding that the expert "lacked the knowledge of the condition of plaintiff's eye" when he entered the emergency room. *Reed*, 325 Ill. App. 3d at 844. In *Gariti*, the defendant's medical expert testified that defendant motorist suffered from a diabetic attack, which caused his vehicle to swerve across the center line and collide with the plaintiff's car. The reviewing court considered this testimony highly speculative and improper because there was no evidence that the defendant was diabetic before the accident or that his vehicle crossed the center line before the collision.

Both *Reed* and *Gariti* suggest that when an expert's opinion is totally lacking in factual support, it is nothing more than conjecture and guess and should not be admitted as evidence. See also *Wilson v. Bell Fuels, Inc.*, 214 Ill. App. 3d 868, 574 N.E.2d 200 (1991).

In this case, however, there is certainly evidence in the record—from plaintiff's medical history and from clinical tests—to support the differential diagnosis. Dr. Davidson also offered good explanations as to why his diagnosis was reliable. For example, the evidence showed that plaintiff had a history of rheumatoid arthritis. Dr. Davidson testified that rheumatoid arthritis was one of the conditions that would predispose plaintiff to his current neurological difficulties. Further, Dr. Davidson listed plaintiff's prior automobile accident as a possible contributing factor. He pointed out that plaintiff had suffered a serious head injury from his 1968 car accident for which prescription pain medication was appropriate. We believe these examples are sufficient to give Dr. Davidson reliable ground for his conclusion, even though plaintiff did not agree with that conclusion.

## CONCLUSION

For these reasons, we conclude that no reversible error occurred as a result of Dr. Davidson's testimony. The judgment of the circuit court of Will County is affirmed.

Affirmed.

HOLDRIDGE, P.J., and BARRY, J., concur.