NOTICE

Decision filed 02/20/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220552

NO. 5-22-0552

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| CHERYL WILSON, Special Administrator of the Estate of Leslie Wilson, Deceased, | ) ) ) | Appeal from the Circuit Court of Coles County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 17-L-22 |
| AMIT DANDE, M.D., and PRAIRIE, CARDIOVASCULAR CONSULTANTS, LLP, | ) ) ) ) | Honorable Mark E. Bovard, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court, with opinion.
Presiding Justice Vaughan and Justice Welch concurred in the judgment and opinion.

**OPINION**

¶ 1     The plaintiff, Cheryl Wilson, special administrator of the estate of Leslie Wilson, deceased, brought a wrongful death action against the defendants, Amit Dande, M.D., and Prairie Cardiovascular Consultants, LLP, alleging that the defendants' negligent evaluation and treatment of the decedent was a proximate cause of his death. Following a trial, the jury returned a verdict in favor of the defendants. On appeal, the plaintiff claims that the trial court erred in (a) allowing the defendants' medical expert to testify about "possible" causes of the decedent's death, (b) refusing to admit into evidence and to publish the decedent's complete death certificate, including the cause of death, and (c) denying the plaintiff's motion for a directed verdict on the allegation that the defendants failed to properly instruct the decedent to restrict his physical

1

activities while awaiting a heart catheterization procedure. The plaintiff also claims that the verdict was against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 2                                     I. BACKGROUND

¶ 3      In late June 2015, the plaintiff became concerned about the health of her husband, Les Wilson (Les). The plaintiff, a registered nurse, noticed that over the past few weeks Les had become fatigued and increasingly short of breath with exertion. She contacted Les's primary care physician, Dr. David Winograd, and his staff scheduled a physical examination for Les on July 16, 2015. After conducting the physical examination, Dr. Winograd ordered several tests, including a stress test. The stress test was performed on July 27, 2015, and the results suggested a decrease in blood flow from the coronary arteries to the heart. Dr. Winograd referred Les to Dr. Amit Dande for a consultation. Dr. Dande, a partner in Prairie Cardiovascular Consultants, LLP, was an interventional cardiologist on staff at Sarah Bush Lincoln Health Center in Coles County, Illinois. On July 29, 2015, Dr. Dande met with Les, reviewed the results of the stress test, and recommended a cardiac catheterization. His office scheduled the procedure for August 11, 2015.

¶ 4      On August 3, 2015, Les went out to mow the pasture on the family farm. He started early, around 5 a.m., to avoid the heat. At approximately 7:30 a.m., the plaintiff went outside to check on Les. As she walked toward the pasture, she saw that Les was slumped over the steering wheel of his tractor. The tractor was lodged against the barbed-wire fencing. When the plaintiff reached Les, she found that he was dead. Les was survived by the plaintiff and their son, Ben.

¶ 5      On April 21, 2017, the plaintiff filed a wrongful death action against Dr. Dande and Sarah Bush Lincoln Health Center in the circuit court of Coles County. Subsequently, Sarah Bush Lincoln Health Center was voluntarily dismissed from the suit, and Prairie Cardiovascular Consultants, LLP was added as a party defendant. The plaintiff, with leave of court, filed her third

amended complaint on September 30, 2020. In count I, the plaintiff alleged that Dr. Dande was negligent and deviated from the standard of care in that he failed to appreciate the seriousness of the decedent's cardiac condition, failed to timely and adequately perform appropriate diagnostic tests to assess the cardiac condition, failed to timely and appropriately treat the cardiac condition, and failed to provide adequate instructions to the decedent regarding restricting his physical activities. The plaintiff further alleged that the decedent suffered a sudden cardiac death on August 3, 2015, and that his death was proximately caused by one or more of the aforesaid negligent acts or omissions. In count II, the plaintiff alleged that Prairie Cardiovascular Consultants was liable for the negligence of its agent, servant, or employee, Dr. Dande, under a theory of vicarious liability.

¶ 6       Following a period of discovery, the plaintiff filed a pretrial motion *in limine* to prohibit the defendants and their expert from offering any opinions at trial related to "possible" causes of Les Wilson's death. The plaintiff noted that, during a discovery deposition, the defendants' expert, Dr. Edgar Carell, testified that he did not have an opinion, based upon a reasonable degree of medical certainty, about the cause of death. The plaintiff argued that any opinions about "possible" causes of death would be without foundation, speculative, and highly prejudicial to the plaintiff's case. The trial court denied the plaintiff's motion. The court indicated that the defendants' expert could offer opinions within a reasonable degree of medical certainty that there were multiple possible causes of death so long as there was a proper foundation for those opinions.

¶ 7       The jury trial began on February 22, 2022. An overview of the trial testimony follows.

¶ 8                                    *The Plaintiff's Witnesses*

¶ 9       Dr. David Winograd was subpoenaed as a witness in the plaintiff's case. Dr. Winograd testified that he was board certified in internal medicine and provided primary care to adult

3

patients, including Les Wilson. Dr. Winograd identified his medical records on Les, and plaintiff's counsel referred to those records as he asked about the care and treatment that Dr. Winograd provided to Les. Dr. Winograd testified that he first saw Les as a patient in September 2010. At that time, Les was recovering from a stroke in the region of the right brainstem and doing well. Dr. Winograd referred Les to a neurologist for a status update. According to the neurologist's note, Les had nearly returned to his baseline neurological functioning. The neurologist recommended that Les continue to take aspirin as a stroke prophylactic and follow up with Dr. Winograd for blood-pressure monitoring. In a follow-up visit in November 2010, Dr. Winograd noted that Les's neurological examination was normal.

¶ 10    Dr Winograd testified that in December 2010, Les was admitted to the hospital following a motor-scooter accident. According to the hospital record from that admission, Les was riding his scooter when it skidded on the pavement. He was wearing a helmet. A computed tomography (CT) scan of the head revealed some hemorrhagic contusions in the brain apparently caused by the accident. X-rays of the right leg revealed an unstable displaced fracture of the distal fibula that required surgical repair. Dr. Winograd saw Les in the office on December 20, 2010. At that time, Les reported that he felt pretty good and that his memory was returning following the head injury.

¶ 11    In a follow-up visit in February 2011, Les reported that he had been diagnosed with a deep vein thrombosis (DVT) in his right leg. Dr. Winograd explained that a DVT can develop when blood clots form in one or more veins in the body. Dr. Winograd testified that the fibula fracture and surgical repair were the predominant factors contributing to the development of the DVT in the patient's right leg. Dr. Winograd continued to treat Les with anticoagulation therapy. During his next visit in March 2011, Les reported that his neurologist had completed a hypercoagulable work-up to determine whether he had a propensity to develop blood clots. Dr. Winograd informed

4

Les that the results of many of the studies in the workup were likely unreliable and invalid because Les was taking Coumadin and Coumadin can affect parts of the evaluation and produce erroneous results. Dr. Winograd also noted in the patient's record that Les had a heterozygous Factor V Leiden genetic mutation, which can cause abnormal clotting. Dr. Winograd assured Les that the genetic mutation had been present throughout his life, that Les had gone along this far without any blood clot issues, and that therefore the leg fracture and surgery would be the more predisposing factors for the blood clot and DVT in the right leg. In August 2011, Dr. Winograd advised Les that it was less likely that he had a hypercoagulable condition and that it was reasonable to come off the Coumadin. Dr. Winograd offered to refer Les to a hematologist for another opinion.

¶ 12    In September 2011, the consulting hematologist concluded that Les had "chronic" blood clots in veins in the area of the surgically repaired fracture. Les underwent a successful thrombectomy procedure to clear those clots. Dr. Winograd did not recall treating Les for blood clots or a DVT after September 2011, and he never diagnosed Les with a pulmonary embolism. Dr. Winograd noted that DVT does not always present with signs or symptoms, and therefore, he could not definitively say whether Les had an acute DVT after 2011. In a May 2012 visit, Dr. Winograd did not document any abnormalities in Les's neurological examination. Dr. Winograd did not see Les again until the summer of 2015.

¶ 13    On June 30, 2015, Dr. Winograd's office received a call from the plaintiff. She was concerned because Les was experiencing severe fatigue and shortness of breath with exertion. Dr. Winograd evaluated Les on July 16, 2015. At that time, Les's vital signs were taken. Les weighed 231 pounds, his blood pressure was 100/77, and his pulse oximeter reading was 93. Les reported shortness of breath and fatigue. He had a family history of heart disease. Les and the plaintiff also reported that, over the past couple of years, Les had a couple episodes of some visual field defects

5

and occasionally slurred speech. These episodes lasted for a day or two, and then Les returned to normal. Dr. Winograd ordered an ultrasound of the carotid arteries because of the history of visual field defects. He wanted to determine whether there was any blockage of the carotid arteries that supply the brain. The ultrasound showed that Les had less than a 50% blockage of the right and left internal carotid arteries. Dr. Winograd told Les to continue taking blood pressure medication and cholesterol-lowering medication and to get a repeat ultrasound in one year. Dr. Winograd ordered a thyroid blood test to determine whether an underactive thyroid could account for the fatigue, and the results were normal. A basic metabolic profile of the blood was done to assess blood sugar, kidney function, and electrolytes, and those results were also normal. Dr. Winograd also ordered a stress test because of Les's complaints of shortness of breath with exertion, his underlying medical history, and his family history of heart disease. Dr. Winograd testified that the stress test results were suggestive of myocardial ischemia. He stated that myocardial ischemia is a condition that occurs when the oxygen demands of the heart are not being met by the blood supply transporting oxygen to the heart. He referred Les to Dr. Dande for a cardiology consultation. The consultation occurred two days later. Dr. Winograd did not see Les again.

¶ 14    During cross-examination, Dr. Winogard agreed that Les had some risk factors for the development of another stroke. He also agreed that temporary visual field defects and slurred speech can be an indication of a possible TIA[1] or ministroke. Dr. Winograd testified that, because the patient had a DVT in his right leg, it was possible that he could develop blood clots in his right leg in the future. Dr. Winograd agreed that, if a blood clot formed in a person's leg and then broke off, the clot could travel to the lungs and result in a pulmonary embolism. Dr. Winograd acknowledged that he diagnosed Les with chronic venous insufficiency in August 2011 and that it

---

[1]TIA is an abbreviation for temporary ischemic attack.

was possible that Les could develop blood clots in the future due to that condition. On redirect examination, Dr. Winograd testified that Les had no complaints suggestive of a DVT following the surgical thrombectomy in 2011. He also testified that Les did not exhibit any signs of visual field defects or slurred speech during the examination on July 16, 2015.

¶ 15    The plaintiff presented the video deposition of Dr. Thomas Cahill. Dr. Cahill was an employee of Prairie Cardiovascular Consultants and a colleague of Dr. Dande. Dr. Cahill supervised Les Wilson's stress test. Dr. Cahill testified that Les had an exercise stress test, without imaging. He explained that the test begins with a resting electrocardiogram (EKG) and a blood pressure reading. If the patient is stable, the patient is asked to walk on a treadmill. The speed and level of incline are gradually increased through each interval of testing. There are seven intervals, and the duration of each interval is three minutes.

¶ 16    Dr. Cahill testified that Les walked on the treadmill for a total of 6 minutes and 28 seconds. Les did not report chest discomfort, and he demonstrated fairly good exercise tolerance for his age. The test was stopped because of shortness of breath and because the horizontal "ST" depressions on the EKG were typical of "ischemia." Dr. Cahill testified that ischemia occurs when there is reduced blood flow to the heart and that reduced blood flow commonly results from a partial or complete blockage of the arteries that supply the heart. He noted that even a moderate blockage of the arteries can cause a heart attack. Dr. Cahill testified Les scored a minus 4.7 on the Duke Treadmill Score. Dr. Cahill explained that the Duke Treadmill Score is a tool that is used to predict future cardiac events. Les scored in the moderate range, indicating that his five-year life expectancy was 94%. Dr. Cahill testified that he saw nothing on the stress test that would have indicated that Les required an urgent cardiac catheterization. Dr. Cahill agreed that a reasonably careful cardiologist should consider the results of the stress test, the patient's family and medical

history, and the nature and progression of the patient's symptoms when deciding whether a patient should have a cardiac catheterization and how urgently it should be performed. He acknowledged that he did not have any information about Les Wilson's symptom progression, family history, or medical history at the time the stress test was conducted.

¶ 17    Dr. Dande was called an adverse witness in the plaintiff's case. In July 2015, Dr. Dande was the only physician at Sarah Busch Lincoln Health Center who could perform cardiac catheterizations. Dr. Dande treated clinic patients and patients who came into the health center for urgent or emergent procedures. He typically performed cardiac catheterizations from 8 a.m. through 1 p.m. on weekdays. His staff scheduled the nonurgent procedures according to the next available opening on his schedule.

¶ 18    Dr. Dande testified that Les Wilson and his wife presented for a consultation on July 29, 2015. Dr. Dande took a history. According to Dr. Dande's office record, Les reported that he had recently undergone a stress test due to shortness of breath. Les had been experiencing shortness of breath when performing daily household activities for months. Les described it as severe and progressively worsening. He did not have chest pain. Dr. Dande reviewed the results of the stress test done on July 27, 2015. He noted that the test had been stopped just as the patient began the third stage of a seven-stage protocol due to shortness of breath. Dr. Dande testified that the EKG tracings revealed horizontal ST depressions typical of ischemia. He explained that, with ischemia, the blood flow and delivery of oxygen to the heart is reduced and that this condition can lead to a sudden cardiac event. Dr. Dande testified that Les Wilson's problem list included shortness of breath with exertion, hypertension, high cholesterol, obesity, a family history of coronary artery disease, and an abnormal stress test. After considering the symptoms, family and medical history, and results of the stress test, Dr. Dande concluded that Les needed a cardiac catheterization to

8

determine whether there was a blockage of the coronary arteries. He directed his staff to schedule the procedure in the next available time slot. The procedure was scheduled for August 11, 2015. Referring to his office record, Dr. Dande testified that he directed Les to take his medication and continue treatment as directed. Dr. Dande acknowledged that he could not recall giving Les any other instructions. He stated that "there are things I tell normally, but I don't know that I did with him."

¶ 19    During a brief cross-examination, Dr. Dande testified that he typically orders additional tests prior to a cardiac catheterization to make sure the procedure is safe for the patient. Dr. Dande ordered an echocardiogram to make sure Les did not have an enlarged heart, fluid around the heart, or a leaky heart valve. Dr. Dande noted that the stress test did not include pictures of the heart. He stated that a stress test with pictures is more accurate in assessing a blockage.

¶ 20    The plaintiff called Dr. Jeffrey Breall as her medical expert. Dr. Breall was board certified in cardiovascular diseases and interventional cardiology and an academic physician who provided patient care while teaching medical students. Dr. Breall testified that he reviewed the medical records and the depositions taken in the case and that his opinions were based upon his professional experience and his review of the case materials. Dr. Breall opined that Les Wilson was suffering from cardiac disease when he saw Dr. Dande on July 29, 2015. Dr. Breall noted that Les had reported symptoms of progressive shortness of breath and fatigue and that these symptoms were very common in people who have blockages in their coronary arteries. Dr. Breall also noted that Les had several risk factors for developing blockages to the coronary arteries. He was a male over 60 years of age, with high cholesterol, somewhat elevated blood pressure, and a family history of premature coronary disease.

¶ 21    Dr. Breall reviewed the stress test results, including the EKG tracings. He noted that Les had been unable to continue much beyond the second stage of the test and that the EKG tracings revealed depressed horizontal ST segments indicative of insufficient blood flow to the heart muscle. During the recovery phase of testing, Les continued to have depressed ST segments, and there was evidence of premature ventricular contractions. Dr. Breall opined that the results of the stress test suggested a severe blockage of the coronary arteries that required urgent attention. He testified that the progressive worsening of shortness of breath with everyday activities, together with the patient's known risk factors and the abnormal stress test, indicated the patient had unstable angina. Based upon the patient's symptoms, medical history, and results of the stress test, a reasonably prudent cardiologist would notify the patient that a heart catheterization should be done within 48 hours and that, in the meantime, the patient be a "couch potato" and should do nothing that would bring on shortness of breath. Dr. Breall testified that Dr. Dande should have performed a cardiac catheterization on the patient within 48 hours after the office visit or referred the patient to another facility. In addition, Dr. Dande should have placed the patient on medication and instructed him to limit his usual activities until the procedure was done.

¶ 22    In addition, Dr. Breall testified, based upon a reasonable degree of medical certainty, that the likely cause of the patient's death was obstructive coronary disease leading to a fatal arrhythmia, or "sudden cardiac death." Dr. Breall opined that the failure to instruct the patient to rest until the catheterization procedure contributed to the death. Dr. Breall further opined that, if the coronary artery disease had been timely diagnosed and treated, Les would have been able to return to a normal active life, with an average life expectancy of another 18 years.

¶ 23    During cross-examination, Dr. Breall testified that, while he concluded that a fatal arrhythmia was the most likely cause of death, he could not rule out a stroke as the cause of death.

10

Dr. Breall acknowledged that Les Wilson's medical history included a stroke in 2010, a DVT resulting from an ankle fracture and surgery, and Factor V Leiden deficiency. Defense counsel asked whether the Factor V Leiden deficiency made it 5 to 10 times more likely that Les could develop a blood clot in his leg. Dr. Breall answered that Les had a "heterozygous" Factor V Leiden deficiency and that its significance was uncertain. Dr. Breall agreed that, once a person has a DVT, it is slightly more likely that he may have another one. He agreed that symptoms of visual field defects and slightly slurred speech that last for a couple of days could represent a TIA or ministroke and that a history of a prior stroke and subsequent TIA or ministroke may make a future stroke more likely.

¶ 24 During redirect examination, Dr. Breall testified that DVTs are very common after a fracture and surgery. In this case, Les Wilson developed chronic clots following the surgical repair of fibula fracture, and after those clots were cleared, he did not have any further complaints consistent with a DVT. Dr. Breall also testified that there was no evidence that Les Wilson had a pulmonary embolism.

¶ 25 The plaintiff testified that she and Les married on August 3, 1980. At that time, she was a registered nurse. She worked in a hospital setting and eventually became a house supervisor. Les was a substitute teacher. After a few years of teaching, he began working in the lawn and garden at a local Walmart, and he continued to work there until his death. Les also tended to the land and livestock on the family farm. In 1986, Les and the plaintiff adopted a newborn baby, Ben. The plaintiff testified that Les and Ben were very close. Les went to Ben's choral and theater rehearsals, and they often went fishing and four-wheeling.

¶ 26 The plaintiff also testified extensively about her husband's medical history and treatment. She recalled that Les had a small stroke in 2010, that he fractured his right lower leg and sustained

11

a contusion to the brain in a scooter accident in December 2010, and that he subsequently developed blood clots and a DVT in his right leg. She noted that he recovered from each of these events, that he did not have any further symptoms of a DVT, and that he was never diagnosed with a pulmonary embolism. The plaintiff testified that she accompanied Les to his appointment with Dr. Winograd on July 16, 2015. She testified that Les did not give a history of a couple of episodes of visual field deficits or slurred speech during that visit. She believed there was a mistake in Dr. Winograd's records. The plaintiff also attended her husband's appointment with Dr. Dande. She recalled asking whether Les should stay home and rest, and Dr. Dande indicated Les could go back to work. The plaintiff testified that Les passed away on August 3, 2015—the morning of their thirty-fifth wedding anniversary. Les had gone out to mow the pasture early that morning to avoid the heat. When she went out to check on him, she found him slumped over on the tractor.

¶ 27    Ben Wilson testified in the plaintiff's case. He spoke about his relationship with his father and the presence of his father in his life. He also testified about the loss of his father and the impact it had on his mother.

¶ 28    The plaintiff also presented an expert to testify about the plaintiff's economic damages. At the close of the plaintiff's evidence, the plaintiff moved to admit into evidence Dr. Winograd's records, the exercise stress test report, the EKG tracings, and Dr. Dande's order for the cardiac catheterization. Those exhibits were admitted without objection. The plaintiff also moved for the admission and publication of Les Wilson's death certificate. The trial court admitted the death certificate for the limited purpose of identifying the decedent's date of birth, date of death, and the identity of his surviving spouse. The court denied the request to publish it.

¶ 30    Dr. Dande was recalled in the defendants' case. Dr. Dande testified that he met the applicable standard of care when he treated Les Wilson. Dr. Dande reviewed the patient's chart and saw no indication of a need for an emergent or an urgent catheterization. He explained that an emergency catheterization is necessary when a person presents with a massive coronary event and that an urgent heart catheterization is necessary when there is evidence that a person is having a mild heart attack. Dr. Dande reviewed Les Wilson's stress test, including the EKG tracings, and noted some horizontal ST segment depression, but those were without "high-risk features." Dr. Dande described Les as "one of the most complicated patients" that he had seen, noting his history of a stroke, a scooter accident in which he suffered bleeding in his brain, and the development of blood clots in his leg. Dr. Dande recommended a cardiac catheterization based upon Les's age, some obvious risk factors, and an abnormal stress test. He also recommended that Les have an echocardiogram prior to the procedure to make sure Les did not have an enlarged heart, fluid around the heart, or a leaky heart valve.

¶ 31    Dr. Edgar Carell, a board-certified interventional cardiologist, was the defendants' medical expert. Dr. Carell reviewed the medical records and the depositions in the case. Dr. Carell opined that Dr. Dande met the applicable standard of care. His opinion was based on his 30 years of experience as a practicing cardiologist and his review of Dr. Dande's records. The defendants' attorney then questioned Dr. Carell about the cause of death.

> "DEFENSE COUNSEL: First of all, I want to ask, did you also—do you have an
>
> opinion as to the cause of death or the inability to find a cause of death?
>
> DR. CARELL: I don't have an opinion as to the cause of death.
>
> DEFENSE COUNSEL: Well, are there multiple possibilities?

DR. CARELL: There are.

DEFENSE COUNSEL: Can you tell me what those possibilities are?

DR. CARELL: So—

PLAINTIFF'S COUNSEL: Your Honor, I'm going to object to the form of what's possible.

THE COURT: Consistent with the Court's prior ruling on the motion pretrial, I will overrule the objection and note your ongoing objection.

PLAINTIFF'S COUNSEL: Ongoing objection so I don't have to interrupt again.

THE COURT: I agree.

\* \* \*

DEFENSE COUNSEL: Doctor, do you have an opinion as to the possibilities of the cause of death in Mr. Les Wilson?

DR. CARELL: Yes. Well, we don't know why he died. There was no autopsy. There are many things that could cause somebody to die suddenly or unexpectedly. Thinking about it, he certainly could have had a stroke. He could have had what's called an intercranial hemorrhage, bleeding into the brain. He could have had what's called an aortic dissection [or] tear of the major vessel in the chest. He could have had an aortic aneurysm that ruptured. He could have had a pulmonary embolism, a blood clot to the lung that can kill you suddenly; and he, of course, could have had a heart attack as well.

DEFENSE COUNSEL: Do—are there things in Mr. Wilson's records that make one of these or a couple of these more likely than others?

DR. CARELL: Well, he's had prior stroke, so he's at increased risk for stroke. He has had deep vein thrombosis, blood clot in the leg, so he's at risk increased risk for

14

recurrent deep vein thrombosis. That would increase his risk for pulmonary embolus, blood clot to the heart. And I believe he had Factor V Leiden Deficiency also, and that increases his risk of blood clots as well. I think those things are certainly possible based upon his history."

¶ 32 Dr. Carell also testified that the episodes of slurred speech and blurred vision are warning signs for TIAs or ministrokes. Dr. Carell opined that the Duke Treadmill Score placed the patient at an intermediate risk for a future cardiac event. Dr. Carell did not agree that Les needed an urgent catheterization. He explained that the subset of people who require an urgent procedure include those who have a rapid acceleration of symptoms, symptoms that do not go away with rest, symptoms that come on at rest, or those who walk into the emergency room with evidence that they have had a minor heart attack. Dr. Carell testified that a person who has had shortness of breath for some weeks or months needs further evaluation but that it does not mean that the person needs an emergency procedure. Dr. Carell opined that Les Wilson's life expectancy was less than 10 years due to his history and multiple medical problems.

¶ 33 During cross-examination, plaintiff's counsel asked, "You're not offering any opinion within a reasonable degree of medical certainty as to the likely cause of Mr. Wilson's death, correct?" Dr. Carell replied, "None of us know why he died, that is correct." "I don't know why he died." Plaintiff's counsel proceeded to cross-examine Dr. Carell about the possible causes of death to which Dr. Carell had testified. Dr. Carell was unable to point to any entry in the medical records indicating that Les had been previously diagnosed with a TIA, a pulmonary embolism, or a recurrent DVT. Dr. Carell explained that Les was at increased risk for pulmonary embolism and recurrent DVT because of his history of DVT and the Factor V Leiden deficiency. He also testified that the patient's history of episodes of visual field deficits and slurred speech that lasted a day or

15

two was noted in Dr. Winograd's records and that these episodes were consistent with a TIA or ministroke.

¶ 34    During further cross-examination, Dr. Carell testified that Les Wilson's chief complaint was exertional shortness of breath and fatigue that was progressively getting worse. Les had several risk factors for coronary artery disease, including his age, high blood pressure, high cholesterol, obesity, a family history of coronary artery disease, and the abnormal stress test. Dr. Carell stated that, given the risk factors, a reasonably careful cardiologist would include coronary artery disease in a differential diagnosis and consider further evaluation. If the patient was stable, it was quite reasonable to set the cardiac catheterization for the next available opening in the schedule. Dr. Carell opined that Les Wilson did not meet the usual criteria for an urgent cardiac catheterization. Dr. Carell testified that a patient such as Les should be given some instructions on what to do while waiting for the procedure. He stated that the patient should be told not to engage in any activities that made him feel bad.

¶ 35    On redirect examination, Dr. Carell testified that the patient should be told to be reasonable. "Use common sense. Don't push yourself. You're not feeling well, let's just take it easy until we get to the bottom of this." Dr. Carell agreed that if the patient was feeling well, generally, he could do what he wanted.

¶ 36    According to the record, the jury began deliberations at noon on February 28, 2022. At 2:05 p.m., approximately two hours into deliberations, the jury asked to see Dr. Dande's office record dated July 29, 2015, and the death certificate. After hearing from the parties' attorneys, the trial court permitted the jury to view Dr. Dande's record but declined to permit the jury to view the death certificate. In a note to the jury, the court explained, "The Death Certificate was admitted for the purpose of showing Leslie Wilson's date of birth, date of death, and who his surviving

16

spouse is. You should consider it for these purposes." At 3:07 p.m., the jury returned a verdict in favor of the defendants. The plaintiff's posttrial motion was denied. This appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38    In the first point on appeal, the plaintiff contends that the trial court erred in allowing the defendants' expert, Dr. Carell, to testify as to "possible" causes of death. The plaintiff claims that Dr. Carell's testimony was based on conjecture and lacked an adequate factual foundation, in violation of a pretrial order. The plaintiff further claims that the error resulted in unfair prejudice, and she seeks a new trial.

¶ 39    Prior to trial, the plaintiff filed a motion *in limine* and sought to prohibit the defendants' expert, Dr. Edgar Carell, from offering any opinions regarding potential causes of the decedent's death. The plaintiff argued that during a discovery deposition, Dr. Carell testified that he did not have an opinion as to Les's cause of death and that any opinions regarding other possible causes of death would be based on conjecture, unsupported by evidence, and highly prejudicial.

¶ 40    In a written order issued on April 15, 2021, the trial court denied the plaintiff's motion. The court noted that Dr. Carell had been disclosed to opine that fatal arrhythmia due to obstructive coronary artery disease was one possible cause of death and that stroke and pulmonary embolism were also possible causes. The court further noted that it was aware of the testimony given by Dr. Carell in his discovery deposition. "Assuming there is a proper foundation" upon which Dr. Carell can base his opinions (*i.e.* Mr. Wilson's medical history), "he may offer opinions" within a reasonable degree of medical certainty that there were other possible causes of death. The court did not believe that this testimony would be speculation or conjecture because the witness "would be applying medical principles to his medical history and the facts of this case." The court

17

concluded that the witness's testimony would likely assist the trier of fact in assessing the issues and that the plaintiff could thoroughly cross-examine the witness on his opinions.

¶ 41    Generally, expert testimony is admissible if the proffered expert is qualified by knowledge, skill, training, or education and the testimony will assist the trier of fact in understanding the evidence. *Matuszak v. Cerniak*, 346 Ill. App. 3d 766, 771-72 (2004). The decision to admit an expert's opinion testimony lies within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent an abuse of discretion. *Matuszak*, 346 Ill. App. 3d at 772.

¶ 42    It is permissible for a medical expert to testify about his opinion in terms of possibilities or probabilities, but the opinion must be based upon a reasonable degree of medical certainty. *Matuszak*, 346 Ill. App. 3d at 772; *Baird v. Adeli*, 214 Ill. App. 3d 47, 65 (1991). An expert may testify about possible causes of an injury based upon facts assumed to be true. *Scassifero v. Glaser*, 333 Ill. App. 3d 846, 852 (2002). However, an expert may not guess, surmise, or conjecture as to a possible cause for the injury based on matters that could not be shown to have existed. *Baird*, 214 Ill. App. 3d at 65.

¶ 43    In this case, Dr. Carell testified that he did not have an opinion to a reasonable degree of medical certainty as to the cause of death. He was then asked whether there were multiple possible causes of death. The plaintiff immediately objected. Consistent with the pretrial ruling, the court overruled the objection and granted the plaintiff's request for a continuing objection. Dr. Carell testified that there are many things that could cause someone to die suddenly or unexpectedly, including stroke, intercranial hemorrhage, aortic dissection, pulmonary embolus, and heart attack. When asked whether there were any things in Les Wilson's medical records that would make any of those causes more likely, Dr. Carell indicated that Les had a history of a stroke, which placed

18

him at increased risk for stroke, and that his history of a prior DVT increased his risk for a recurrent DVT and pulmonary embolism. Dr. Carell also believed a Factor V Leiden deficiency placed him at an increased risk of blood clots and that the episodes of slurred speech and blurred vision were warning signs for TIAs or ministrokes.

¶ 44    After reviewing Dr. Carell's testimony, we find that his introductory statement, that many things "could cause someone to die suddenly or unexpectedly," was not based upon the medical information specific to Les Wilson and that there was no factual foundation to support an aortic dissection or an aortic aneurysm as a possible cause of death in this case. Nevertheless, the record shows that this was a single, prefatory statement, and we do not find that it resulted in unfair prejudice to the plaintiff.

¶ 45    Dr. Carell's opinions that Les could have died from a stroke, a recurrent DVT, or a pulmonary embolism were based upon the patient's medical history. For example, Dr. Carell testified that Les had a prior right brainstem stroke and subsequent episodes of temporary visual field deficits and slurred speech, which placed him at risk for a stroke. Dr. Carell also testified that Les had a prior DVT that injured the affected veins. The prior DVT placed the patient at risk for another DVT and a pulmonary embolism secondary to a DVT. Notably, the plaintiff introduced this prior medical history through Dr. Winograd's medical records and his testimony. Thus, the facts upon which Dr. Carell based his opinions did exist and had been admitted into evidence prior to Dr. Carell's testimony. The record shows that plaintiff's counsel thoroughly cross-examined Dr. Carell about his opinions regarding "other possible causes" of death and the basis for his opinions. And, while the plaintiff's own expert opined that the most medically likely cause of death was obstructive coronary artery disease, he acknowledged that he could not rule out other possible

19

causes. After thoroughly reviewing the testimony and medical evidence in this record, we cannot say that the trial court abused its discretion in allowing the testimony.

¶ 46    Next, the plaintiff contends that the trial court abused its discretion in refusing to admit into evidence and publish the cause of death listed in Les Wilson's death certificate. The plaintiff claims that the death certificate was a public record prepared pursuant to the official duties of the coroner and considered to be reliable and trustworthy and, therefore, admissible pursuant to Rule 803(8)(C) of the Illinois Rules of Evidence (Ill. R. Evid. 803(8)(C) (eff. Sept. 28, 2018)) and section 115-5.1 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/115-5.1 (West 2020)).

¶ 47    The record reveals that, prior to the close of the plaintiff's case, the plaintiff asked the trial court to take judicial notice of Les Wilson's death certificate, which included the cause of death, to admit the entire death certificate into evidence, and to allow it to be published to the jury. The plaintiff argued that the death certificate was a public record and therefore admissible under Illinois Rule of Evidence 803(8)(C) (eff. Sept. 18, 2018). In response, the defendants argued that there was no information as to the qualifications of the coroner to offer an opinion as to cause of death. After considering the matter, the trial court denied the plaintiff's request to take judicial notice of the cause of death or admit it into evidence. The court found that the death certificate was a public record and self-authenticating but that the cause of death was an opinion of the coroner for which there was no foundation. The court further found that the coroner's qualifications and the facts and information on which the coroner based the opinion as to cause of death were unknown, as the coroner had not been deposed and did not testify at trial. The court concluded that it would have been improper to take judicial notice of, and admit into evidence, an opinion on a contested issue

20

without the necessary foundation. The trial court admitted the death certificate for the limited purpose of identifying the decedent's date of birth, date of death, and surviving spouse.

¶ 48 The trial court revisited this issue later in the proceedings. During deliberations, the jury sent a note to the trial court, asking to see the death certificate. The trial court summoned the attorneys and advised them of the jury's request. After hearing from counsel, the court stated that it would stand by its earlier ruling. The court prepared a written response, informing the jury that the death certificate had been admitted for the purpose of identifying the decedent's date of birth, date of death, and surviving spouse and that they should consider it for that purpose.

¶ 49 The death certificate is contained in the record on appeal. The death certificate identified the date of death as August 3, 2015, and the cause of death as "sudden cardiac death due to probable myocardial infarction," secondary to "hypertensive cardiovascular disease." The county coroner, Donna Marie Whitaker, certified the cause of death. The death certificate also indicated that no autopsy was performed and therefore autopsy findings were not used to conclude the cause of death.

¶ 50 Generally, a document that is offered for the truth of the matter asserted is considered hearsay and inadmissible unless it comes within an exception to the rule against hearsay. The plaintiff claims that the death certificate is admissible under the public records exception to the hearsay rule. The public records exception is found in Illinois Rule of Evidence 803(8) (eff. Sept. 28, 2018). It provides that the following records are not excluded by the hearsay rule:

"Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report ***, or (C) in a civil case or against the State in a criminal case, factual findings from a legally

21

authorized investigation, *but not findings containing expressions of opinions or the drawing of conclusions*, unless the opposing party shows that the sources of information or other circumstances indicate lack of trustworthiness." (Emphasis added.) Ill. R. Evid. 803(8) (eff. Sept. 28, 2018).

¶ 51 Under Rule of Evidence 803(8), official records maintained by public officials in connection with the performance of their official duties are generally admissible as an exception to the hearsay rule if required by statute or authorized to be maintained by the nature of the office. Ill. R. Evid. 803(8) (eff. Sept. 28, 2018). However, the rule expressly provides that, in civil cases, findings containing the expression of opinions or the drawing of conclusions within official records are not admissible under this exception. Ill. R. Evid. 803(8)(C) (eff. Sept. 28, 2018). Official records that concern causes and effects involving the exercise of judgment and discretion, expression of opinions, or the drawing of conclusions are not admissible under the public records exception, and because official documents are a substitute for the personal appearance of the official, it is generally held that such documents, to be admissible, must concern matters that the official would be qualified to testify to at trial. *Bloomgren v. Fire Insurance Exchange*, 162 Ill. App. 3d 594, 598-99 (1987); *Lombard Park District v. Chicago Title & Trust Co.*, 105 Ill. App. 2d 371, 378-79 (1969). As with all evidence, the proponent of a public record must lay an adequate foundation, establishing that the public document is reliable and accurate. *People v. Kautz*, 272 Ill. App. 3d 444, 450 (1995).

¶ 52 In this case, the trial court correctly concluded that the cause of death statement in the death certificate was the expression of the coroner's opinion. The plaintiff did not make an offer of proof as to the qualifications of the coroner or the factual basis for the coroner's opinion as to cause of death, nor did the plaintiff otherwise show that the evidence was reliable and accurate.

22

Accordingly, the plaintiff failed to demonstrate that the coroner's opinion as to the cause of death was admissible under Rule 803(8) of the Illinois Rules of Evidence.

¶ 53    The plaintiff also claims that the death certificate was admissible under section 115-5.1 of the Code of Criminal Procedure (725 ILCS 5/115-5.1 (West 2020)). We note that the plaintiff did not rely upon section 115-5.1 in her arguments before the trial court. It is only on appeal that the plaintiff specifically argues that the death certificate should have been admitted pursuant to section 115-5.1. Nevertheless, we find that the plaintiff's reliance on this section is misplaced.

¶ 54    Section 115-5.1 of the Code of Criminal Procedure provides as follows:

"§ 115-5.1. In any civil or criminal action the records of the coroner's medical or laboratory examiner summarizing and detailing the performance of his or her official duties in performing medical examinations upon deceased persons or autopsies, or both, and kept in the ordinary course of business of the coroner's office, duly certified by the county coroner or chief supervisory coroner's pathologist or medical examiner, shall be received as competent evidence in any court of this State, to the extent permitted by this Section. These reports, specifically including but not limited to the pathologist's protocol, autopsy reports and toxicological reports, shall be public documents and thereby may be admissible as prima facie evidence of the facts, findings, opinions, diagnoses and conditions stated therein.

A duly certified coroner's protocol or autopsy report, or both, complying with the requirements of this Section may be duly admitted into evidence as an exception to the hearsay rule as prima facie proof of the cause of death of the person to whom it relates. The records referred to in this Section shall be limited to the records of the results of post-mortem examinations of the findings of autopsy and toxicological laboratory examinations.

23

Persons who prepare reports or records offered in evidence hereunder may be subpoenaed as witnesses in civil or criminal cases upon the request of either party to the cause." 725 ILCS 5/115-5.1 (West 2020).

¶ 55    Reading the provisions in section 115-5.1 together, we conclude that the records that may be admitted into evidence to establish the cause of death are limited to the records of the results of postmortem examinations, of the findings of autopsy, and toxicological laboratory examinations performed by the coroner's medical examiner or laboratory examiner. See 725 ILCS 5/115-5.1 (West 2020).

¶ 56    In *Steward v. Crissell*, 289 Ill. App. 3d 66, 72 (1997), our colleagues in the First District considered whether the medical examiner's toxicology report of the decedent's blood was admissible under section 115-5.1. In considering the issue, the First District commented on the interplay between section 115-5.1 of the Code of Criminal Procedure and section 8-2201 of the Code of Civil Procedure,[2] stating, in part, as follows:

"The statements of relevant and material facts in certified records of the coroner or medical examiner, kept in the ordinary course of business, are all admissible in evidence, as long as the preparers of the reports are available for examination upon the request of either party. Such admissible facts include measurements of the scene, descriptions of the wounds, and medical reports, including toxicology reports, concerning the deceased. Assessments of the cause of death have more limited admissibility: the coroner's verdict, concerning the cause and material circumstances surrounding the death (see 55 ILCS 5/3-3025 (West 1994)), is

[2]Section 8-2201 of the Code of Civil Procedure addresses the admissibility of coroner's records. "In actions or proceedings for the recovery of damages arising from or growing out of injuries caused by the negligence of any person, firm or corporation resulting in the death of any person or for the collection of a policy of insurance, neither the coroner's verdict returned upon the inquisition, nor a copy thereof, shall be admissible as evidence to prove or establish any of the facts in controversy in such action or proceeding." 735 ILCS 5/8-2201 (West 2020).

24

entirely inadmissible in all civil proceedings for damages. 735 ILCS 5/8-2201 ([West] 1994). Only the coroner's protocol or autopsy report is admissible as evidence of the cause of death, again providing that the preparer is available by subpoena for examination." *Steward*, 289 Ill. App. 3d at 72.

¶ 57 In this case, the evidence at issue is the cause of death statement in the decedent's death certificate. We are not dealing with the coroner's protocol or an autopsy report. There is no evidence to suggest that a postmortem examination was performed on the decedent, and the death certificate states that no autopsy was performed. Thus, the death certificate was not admissible under section 115-5.1.

¶ 58 In sum, the plaintiff sought to introduce the death certificate as evidence of the decedent's cause of death. The death certificate was self-authenticating and therefore *prima facie* evidence of the facts stated therein, but the cause of death statement in the death certificate was an opinion of the coroner, unsupported by any factual foundation or any information regarding the qualifications of the coroner. The cause of death was a disputed issue, and the trial court was not required to accept the cause of death statement in the death certificate without any foundation. In the absence of an adequate foundation, the trial court did not abuse its discretion in refusing to take judicial notice of or admit the cause of death statement in the death certificate into evidence.

¶ 59 The plaintiff next claims that the trial court erred in denying her motion for a directed verdict on the allegation that the defendants were negligent in failing to properly instruct the decedent to restrict his physical activities until he underwent the cardiac catheterization. The plaintiff also claims that the trial court erred in denying the plaintiff's tendered jury instruction directing the jury to find that the plaintiff met her burden of proof on that allegation.

25

¶ 60 A directed verdict serves to remove an issue from the province of the jury. *Robbins v. Professional Construction Co.*, 72 Ill. 2d 215, 224 (1978). A directed verdict is proper only where all of the evidence, when viewed in a light most favorable to the nonmoving party, so overwhelmingly favors the moving party that no contrary verdict based upon that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). The trial court's ruling on a motion for directed verdict is reviewed *de novo*. *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225 (2010).

¶ 61 To prevail on a cause of an action for medical negligence, a plaintiff must establish (1) the applicable standard of care, (2) a deviation from that standard of care, and (3) an injury proximately caused by the deviation from the standard of care. *Purtill v. Hess*, 111 Ill. 2d 229, 241-42 (1986). In a medical negligence case, the standard of care fits within the duty element and requires the defendant to act with the same degree of knowledge, skill, and ability as an ordinarily careful professional would act under similar circumstances. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 294-95 (2000). Expert medical testimony is usually required to establish these elements. *Johnson v. Armstrong*, 2022 IL 127942, ¶¶ 52-53. Whether a medical professional deviated from the applicable standard of care and whether that deviation was a proximate cause of the plaintiff's injury are questions for the factfinder. *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 423 (1975).

¶ 62 In this case, there was conflicting expert testimony as to the urgency of the decedent's condition and what instructions should have been given while he awaited the cardiac catheterization procedure. The plaintiff's expert, Dr. Breall, testified that the decedent required an urgent cardiac catheterization, within 48 hours, and that Dr. Dande should have instructed the decedent to be a "couch potato" and do nothing that would bring on shortness of breath until the

26

procedure was performed. The defendants' expert, Dr. Carell, disagreed. Dr. Carell opined that Dr. Dande met the applicable standard of care in treating the decedent. Dr. Carell testified that there was no indication that the decedent required an urgent catheterization and that a reasonably careful cardiologist would instruct a patient to be reasonable, to refrain from activities that made him feel poorly, and that, if the patient was feeling well, generally he could do what he wanted to do. Dr. Carell also testified that in patients like the decedent who have had a history of blood clots or DVT, being sedentary would increase the risk for the development of another DVT and, potentially, a pulmonary embolism. Viewing all of the evidence and reasonable inferences on this issue in a light most favorable to the defendants, we cannot conclude that it so overwhelmingly favors the plaintiff that no contrary verdict based on that evidence could ever stand. Therefore, the trial court did not err in denying the plaintiff's motion for a directed verdict on the allegation that the defendants were negligent in failing to properly instruct the decedent to restrict his physical activities while awaiting the cardiac catheterization and in refusing the plaintiff's proffered jury instruction on that matter.

¶ 63     Finally, the plaintiff contends that the jury's verdict was against the manifest weight of the evidence. A jury verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence. *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003). As the trier of fact, it is the jury's role to weigh the evidence, assess the credibility of the witnesses, and resolve conflicts in the expert testimony, and the appellate court cannot substitute its judgment on questions of fact fairly submitted, tried, and determined from the conflicting evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53 (1992). A reviewing court may reverse a jury verdict only if it is against the manifest weight of the evidence. *Snelson*, 204 Ill. 2d at 35. In this case, the jury heard from expert

27

witnesses and treating physicians who rendered opinions on the treatment provided to Les Wilson, and the medical testimony was conflicting. The jury could have reasonably concluded that the plaintiff failed to demonstrate within a reasonable degree of medical certainty that the defendants deviated from the applicable standard of care and/or that the deviation more likely than not was a proximate cause of Les Wilson's death. After reviewing the record, we conclude that the jury's verdict was not against the manifest weight of the evidence.

¶ 64                                    III. CONCLUSION

¶ 65    Accordingly, the judgment of the circuit court is affirmed.

¶ 66    Affirmed.

28

## *Wilson v. Dande*, 2024 IL App (5th) 220552

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Coles County, No. 17-L-22; the Hon. Mark E. Bovard, Judge, presiding. |
| **Attorneys for Appellant:** | Nathaniel O. Brown, of Weilmuenster, Keck & Brown, P.C., of Belleville, for appellant. |
| **Attorneys for Appellee:** | Randall A. Mead and Christian D. Biswell, of Drake, Narup & Mead, P.C., of Springfield, for appellees. |